**In The Matter of READING COMPANY, Debtor.**

**Bankruptcy No. 71–828.**

United States District Court,
E.D. Pennsylvania.

Aug. 11, 1982.

See also, Bkrtcy., 24 B.R. 858.

A. Grant Sprecher, Howard H. Lewis, John J. Ehlinger, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Reading Co.

William P. Quinn, Nicholas J. Scafidi, Eric M. Hocky, Rubin, Quinn, Moss & Girard di-Carlo, Philadelphia, Pa., for Trailer Train Co.

## ADJUDICATION

DITTER, District Judge.

This matter comes before the Court on a petition filed by the trustees of the Reading Company ("Reading")[1] seeking to compel the Trailer Train Company ("Trailer Train") to negotiate a means by which Reading can obtain some benefit from its

---

1. The petition was filed by the trustees of the Reading while that company was in reorganization pursuant to section 77 of the Bankruptcy Act, 11 U.S.C. § 205. By memorandum and Order No. 2004, I approved the various documents needed to implement the plan of reorganization, authorized the trustees to execute them, and generally permitted the trustees to take various steps necessary for the consummation of the plan. *See In the Matter of Reading Company,* No. 71–828 (E.D.Pa. Dec. 23, 1980). Pursuant to this order, Reading emerged from reorganization on January 1, 1981.

ownership of Trailer Train capital stock. The problem arises because Trailer Train was created for the sole purpose of providing equipment to railroads at advantageous rates and Reading is no longer in the railroad business. By Order No. 1557, I required the parties to seek agreement on a way for Reading to realize a return on its investment even though it no longer could use Trailer Train equipment. The negotiations proved fruitless. Reading then filed an amended petition to compel Trailer Train to repurchase the stock at a value adequately reflecting Reading's equity interest or, alternatively, to exchange the stock for a subordinate debt instrument or preferred stock having a face value in that amount and bearing a market rate of interest. After extensive discovery, the parties presented evidence at a four-day hearing. Pursuant to Fed.R.Civ.P. 52(a), I make the following:

## FINDINGS OF FACT

1. The Reading Company is a Pennsylvania corporation having its corporate headquarters in Plymouth Meeting, Pennsylvania. For many years prior to April 1, 1976, Reading's principal business was as an interstate railroad, transporting both passengers and freight. From November 21, 1971, until January 1, 1981, Reading was in reorganization pursuant to section 77 of the Bankruptcy Act, 11 U.S.C. § 205.

2. Trailer Train is a Delaware corporation, having been incorporated in Delaware on November 9, 1955. The Company's corporate headquarters are located in Chicago, Illinois.

3. Trailer Train owns, operates, and maintains a pool of standardized railroad flat cars used by railroads in the United States under a pooling agreement entered into between it and its shareholders with the approval of the Interstate Commerce Commission ("ICC"). (Stipulation of Facts ("Stip.") No. 4)

4. As of December 31, 1979, the Trailer Train flat car pool consisted of 87,494 intermodal, autorack, and special use cars.

As of June, 1979, Trailer Train owned or leased approximately 92 percent of all intermodal flat cars, and approximately 87–88 percent of all automotive rail cars, used in rail service in the United States. (Stip. No. 6)

5. Reading owns 500 of the 20,500 shares, or 2.44 percent of the outstanding capital stock of Trailer Train. (Stip. No. 3)

6. The remaining capital stock of Trailer Train is owned by 30 operating railroads, the trustees of the estate of the Erie Lackawanna Railway Company, and Transway International Corp., a diversified freight forwarding company. The 30 operating railroads represent approximately 89 percent of the mileage of the class 1 railroads in the United States. (Stip. No. 5; Tr. 122)

7. The shareholders of Trailer Train, and the percentage of outstanding stock held by each, are:

2.44%—The Atchison, Topeka and Sante Fe Railway Company;

2.44%—The Baltimore and Ohio Railroad Company;

2.44%—Robert W. Meserve and Benjamin H. Lacy, Trustees—Boston and Maine Corporation;

7.32%—Burlington Northern Inc.;

2.44%—Central of Georgia Railroad Company;

2.44%—The Chesapeake and Ohio Railway Company;

4.88%—Chicago and Northwestern Transportation Company;

2.44%—Stanley Hillman, Trustee—Chicago, Milwaukee, St. Paul and Pacific Railroad Company;

2.44%—William Gibbons—Trustee—Chicago, Rock Island and Pacific Railroad Company;

4.88%—Consolidated Rail Corporation;

2.44%—The Denver and Rio Grande Western Railroad Company;

2.44%—Detroit, Toledo and Ironton Railway Company;

2.44%—Thomas F. Patton and Ralph S. Tyler, Jr., Trustees—Erie Lackawanna Railway;

2.44%—Florida East Coast Railway Company;

4.88%—Illinois Central Gulf Railroad Company;

2.44%—The Kansas City Southern Railway Company;

2.44%—Louisville and Nashville Railroad Company;

2.44%—Missouri-Kansas-Texas Railroad Company;

4.88%—Missouri Pacific Railroad Company;

4.88%—Norfolk and Western Railway Company;

2.44%—Norfolk and Western Railway Company, Lessee of Wabash Railroad Co. Under lease dated March 1, 1961, as Supplemented and Amended;

2.44%—The Reading Company;

2.44%—Richmond, Fredericksburg and Potomac Railroad Company;

2.44%—St. Louis-San Francisco Railway Company;

2.44%—St. Louis Southwestern Railway Company;

4.88%—Seaboard Coast Line Railway Company;

2.44%—Southern Pacific Transportation Company;

2.44%—Southern Railway Company;

2.44%—Toledo, Peoria and Western Railroad Company;

2.44%—Transway International Corporation;

2.44%—Union Pacific Railroad Company;

2.44%—Western Maryland Railway Company; and

2.44%—The Western Pacific Railroad Company.

(Stip. No. 15).

8. Trailer Train was incorporated in 1955 by the Pennsylvania Railroad Company, its then affiliate, Norfolk and Western Railway Company, and Rail Trailer Company, a consulting firm to the railroad industry. (Stip. No. 10; Tr. 118).

9. Trailer Train added new shareholders from 1956 to 1964 as follows:

1956: St. Louis-San Francisco Railway Co; Missouri-Kansas-Texas Railroad; Missouri-Pacific Railroad Co.; Chicago, Burlington & Quincy Railroad; Wabash Railroad Company; Boston & Maine.

1957: Chicago & Northwestern Railway.

1958: Baltimore & Ohio Railroad.

1959: Illinois Central Gulf, Mobile & Ohio; Louisville-Nashville; Atlantic Coast Line; Seaboard Air Line; Western Pacific; New York, Chicago & St. Louis; St. Louis Southwestern.

1960: Atchison, Topeka & Sante Fe: Great Northern; Northern Pacific; Chesapeake & Ohio; Chicago & Great Western; Texas & Pacific; Detroit, Toledo & Ironton, Kansas City Southern; Chicago, Milwaukee, St. Paul & Pacific; Toledo, Peoria & Western; Richmond, Fredericksburg & Potomac; Southern; Southern Pacific; Union Pacific; U.S. Freight Co. (now Transway International Corp.)

1961: Reading Company; Central of Georgia.

1963: Western Maryland; Denver, Rio Grande & Western.

1964: Chicago, Rock Island & Pacific, Erie Lackawanna, New York Central.

Since 1964, there has been no sale of Trailer Train stock except through combinations or reorganizations of its existing shareholders. (Stip. No. 11; Exh. 28).

10. The first 11 shareholders of Trailer Train acquired 500 shares of the company's stock at the par value of $100.00. Thereafter, each additional shareholder which purchased its block of stock from Trailer Train paid then current book value for its initial subscription of 500 shares. The highest book value paid by any subscriber was $484,900.00. (Stip. No. 12)

11. Originally, each of the Company's individual equipment financings was jointly and severally guaranteed by every Trailer Train shareholder. These individual guarantees were replaced by "Keep Well" agreements which allowed the Company to finance new equipment acquisitions on its own balance sheets.

The first of the "Keep Well" agreements was the shareholders' agreement of October 25, 1960, wherein all shareholders jointly

and severally guaranteed all pre-1962 equipment obligations. Each shareholder that joined Trailer Train after 1960 has executed this shareholder's agreement.

A subordination agreement dated May 15, 1963, provides that a shareholder's claims against the Company will be junior to any claim against the Company by owners of equipment obligations.

A note purchase agreement of January 1, 1967, required each shareholder to purchase agreed proportions (in accordance with each shareholder's usage of Trailer Train equipment) of up to $50,000,000 in notes issued by the Company. Reading purchased $88,-000. of a total of $20,000,000 of such notes. The period of time for purchase of additional notes was not extended beyond December 31, 1974. (Stip. No. 14; Tr. 120–21)

12. Reading acquired its 500 shares of Trailer Train stock in 1961, at $300.21 per share, or a total of $150,105. (Stip. No. 23)

13. From the time it purchased Trailer Train stock in 1961 until April 1, 1976, Reading paid a total $908,159.00 for use of Trailer Train flatcars. (Tr. 133 Appendix A).

14. Each of Trailer Train's shareholders purchased a 500 share block of capital stock and entered into a Form A Car Contract with Trailer Train. Execution of the Form A Car Contract by a shareholder is a prerequisite to participation in the flatcar pooling plan. (Stip. No. 19).

15. The Form A contract sets forth the terms and conditions under which Trailer Train furnishes cars to its shareholders and the method and amount of payment for use of Trailer Train cars. This contract also covers such items as responsibility for loss or damage to cars, provision of payment of ad valorem property taxes by Trailer Train, switching and hauling charges, storage and turnback of cars, per diem relief, maintenance, and repairs. (Stip. No. 20).

16. The Trailer Train Form A car contract provides that no shareholder will sell or otherwise dispose of its stock in Trailer Train without first offering such stock to Trailer Train for repurchase, at its option, at then current book value. The Form A car contract also provides that in the event that the contract is terminated in any manner, the affected shareholder or shareholders shall offer to sell to Trailer Train, at its option, such stock at current book value. (Stip. No. 21)

17. Trailer Train cars are provided to shareholders upon request. The shareholder may use the car on its own lines or may interchange the car with other railroads, which may or may not be shareholders and pool participants. (Stip. No. 25)

18. For the time the shareholder is in possession of the Trailer Train car, it is responsible for car hire charges as stated in the Form A car contract. Each Trailer Train participant which delivers a car to a non-participant is responsible for underpayment or non-payment of charges by the nonparticipants. (Stip. No. 26)

19. Trailer Train intermodal cars are a free-running pool in that they are not required to be returned, whether loaded or empty, in the direction of the owner. (Stip. No. 27)

20. Car hire charges for intermodal cars under the Form A car contract are computed on a combination of hourly rates plus mileage charge. (Stip. No. 28)

21. Car hire charges for use of Trailer Train equipment are the same for all railroads whether or not the user is a shareholder of Trailer Train. (Stip. No. 29)

22. Trailer Train's board of directors is comprised of nominees of each of its shareholders. Nearly all of the members of Trailer Train's board of directors are officers of its constituent shareholders. Each shareholder is entitled to nominate one director for each block of 500 shares held by each shareholder. Such nominees are elected to the board of directors by all shareholders. (Stip. No. 16)

23. The finance committee of the board of directors is generally charged with the responsibility of monitoring those financial matters which affect the company including the setting up and review of rates to be charged for the various cars in the Trailer

Train fleet. The committee is appointed annually by the board and consists of the president of Trailer Train and ten other directors of the company. (Stip. No. 17, Tr. 146–48)

24. As of December 31, 1979, nine of the ten largest users of Trailer Train flatcars had director representatives on the finance committee. These ten largest users accounted for 80 per cent of total use of Trailer Train equipment. (Tr. 148–52)

25. Policies with respect to the level or rates charged for the use of Trailer Train equipment are established by Trailer Train's board of directors. Management's recommendations of rate levels are reviewed by Trailer Train's finance committee. The finance committee then makes its recommendations to the board of directors. (Stip. No. 30)

26. The Trailer Train rate policy, is found in Supplement No. 40 of the Form A car contract, as presently stated, in paragraph 16, between Trailer Train and each of its shareholders:

It shall be the policy of Trailer Train to maintain per diem, mileage and other charges at the lowest level required to meet Trailer Train's ordinary and necessary costs and expenses, . . . and to accumulate retained earnings adequate to support continued reasonable enlargement of the number of cars in the pool, to that number found to be needed. It is the intention of the parties hereto that the total compensation paid to Trailer Train by Carrier and all others having Trailer Train car contracts shall be no greater than consistent with the foregoing policy.

(Stip. No. 34; Exh. 1 at 73; Tr. 44)

27. Trailer Train has adhered to this rate policy throughout its entire corporate existence. (Stip. No. 37; Tr. 44)

28. In practice, Trailer Train rates are set on the basis of a complex formula designed primarily to meet the company's debt obligations and operating expenditures. (Tr. 505–09)

29. The rates which railroads charge each other for the use of their rail cars while operating on the lines of another railroad are established by the ICC. The rates established by the ICC are known as "ICC per diem rates" and are calculated in accordance with an ICC published formula. (Stip. No. 31)

30. From 1956 until 1969, the aggregate car hire rates paid by shareholders for use of Trailer Train equipment were higher than rates which those shareholders would have paid under the ICC per diem schedule for the same or similar cars. (Tr. 130, 510)

31. From 1969 through the present, the aggregate car line rates paid by shareholders for use of Trailer Train equipment have been lower than rates which those shareholders would have paid under the ICC per diem schedule for the same or similar cars.

32. This change occurred because in 1969 the ICC changed the formula by which it calculated and set per diem rates. (Tr. 130; 134–35)

33. Trailer Train's management prepared projections of the company's growth, revenues, and net income for the five year period 1979–1984 and for the ten year period, 1979–1988. The projections in the visual presentation of the five year plans for car hire rates for the use of Trailer Train, equipment indicate that such rates will be at levels which are below prevailing ICC rates for the period 1979 through 1988. (Stip. Nos. 40–43)

34. Trailer Train does not try to make as much profit as possible, nor has it ever paid a dividend to its shareholders. (Stip. No. 38; Tr. 16, 44)

35. The benefits of Trailer Train stock ownership are:

(a) For most car types and for most users, rates below ICC rates for the same or similar equipment;

(b) Access to cars without long-term financial obligation;

(c) Access to a free-running pool of intermodal cars;

(d) A pricing policy that encourages broad use of cars.

(e) Standardization of cars, pooling of information concerning car needs, and efficient volume purchases;

(f) Equipment obligations carried as debts of Trailer Train and not of the railroad shareholders. (Tr. 121–23)

36. Reading entered into reorganization proceedings under section 77 of the Bankruptcy Act on November 21, 1971. (Stip. No. 48)

37. The claim asserted by the Reading in this litigation arose on April 1, 1976, when pursuant to the Regional Rail Reorganization Act of 1973, Reading conveyed its rail properties to Conrail and discontinued all rail operations. Reading's shares of Trailer Train stock were reserved from the conveyance and Conrail has disclaimed any right, title, or interest in Reading's Trailer Train stock. (Stip. Nos. 50–54, 56; Tr. 15–16)

38. Until the conveyance of its rail properties to Conrail, Reading used Trailer Train equipment in rail service. (Stip. No. 49; Tr. 25)

39. Because the board of directors of Trailer Train has never declared a dividend on the company's stock, the only benefits of stock ownership flow from access to and use of Trailer Train's fleet of cars. Since the conveyance of its rail properties and the discontinuance of its rail operations, Reading has been unable to derive any benefit from its ownership of Trailer Train stock. (Tr. 16)

40. Prior to the institution of the present action, Reading discussed with Trailer Train the possibility of a change in its dividend policy and of the possibility that Trailer Train might repurchase Reading's stock at current book value. Reading also discussed with Trailer Train the alternative of the creation of a separate class of security or subordinated debt instrument of Trailer Train which could be exchanged by Reading for its capital stock and which would reflect Reading's proportionate ownership of the company, rather than its use of Trailer Train equipment. Reading and its representatives were advised by Trailer Train that it was not interested in and was opposed to such policy changes. (Tr. 16–17)

41. During the same period, Reading also attempted to ascertain whether any of Trailer Train's other shareholders, or a third party, would be interested in purchasing Reading's Trailer Train stock. However, because nearly all of the major railroads in the country are already Trailer Train shareholders and because Trailer Train does not pay dividends, no benefit would accrue to an existing shareholder from owning additional shares. For this reason, there is no market for the stock and Reading has been unable to sell its shares. (Tr. 17)

42. Trailer Train shareholders own from one to three blocks of Trailer Train stock. There are wide variations between the various shareholders' percentage of stock ownership and their proportionate use of equipment. (Stip. No. 44)

43. Owner/user differences have been a subject of discussion among the Company and its shareholders since at least 1970. (Stip. No. 45)

44. Trailer Train has conducted internal studies to find a solution to the matter of different ownership and use, or use and non-use:

(a) In 1971, the board of directors of Trailer Train established a stock ownership and transfer policy committee to consider this and related matters;

(b) In 1975 and 1976, the board of directors of Trailer Train authorized a select committee of shareholder representatives to consider the ownership/user matter in anticipation of the transfer of the Penn Central, Reading, and Erie Lackawanna rail properties to Conrail;

(c) In 1977, Trailer Train management formed an *ad hoc* committee exclusively to consider and develop solutions to the ownership/user matter;

(d) In May, 1978, the Trailer Train finance committee conducted a meeting to evaluate the advisability and consequences of restructuring the company's capital stock to deal with the ownership/user matter. (Stip. No. 58; Tr. 108–9; 111)

45. These committees did not recommend any change in Trailer Train policies. (Tr. 111)

46. After Reading filed its petition to compel negotiations, and before the Court acted on that petition, Trailer Train did negotiate with Reading, and Trailer Train offered to purchase Reading's Trailer Train shares for $500,000. Reading refused this offer. (Tr. 18; 112, 730)

47. On March 6, 1979, following the commencement of this action, Trailer Train retained the law firm of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss") of New York, New York, to study the company's history, objectives, and its "inherent conflicts" (including the non-user matter) and to suggest a solution. (Tr. 112)

48. On April 11, 1979, Paul Weiss engaged the investment banking firm of Morgan Stanley & Company, Inc. ("Morgan Stanley") as financial experts to assist in the study and in particular to "analyze the ownership, structure, objectives and operation of the company and the problems, concerns and conflicts inherent therein, to consider and develop possible alternative solutions, and to recommend steps the company and its shareholders might take to reconcile differing interests of the shareholders and promote the overall best interests of the shareholders as a whole." (Exh. 27; Tr. 112; 236)

49. Morgan Stanley conducted a seven month study of Trailer Train. As part of this study, it reviewed public and internal documents of the company, had discussions with Trailer Train management and committees, and met with representatives of every Trailer Train shareholder. (Tr. 240)

50. Paul Weiss and Morgan Stanley compiled reports which were submitted to Trailer Train on November 21, 1979. Both reports concluded that the common stock of Trailer Train was never intended to be and is not an "investment vehicle" and that the company does not have as its goals the maximization of profits, payment of dividends, or providing its shareholders with a means of realizing a return by virtue of their stock ownership. (Exh. 27, 28)

51. The reports also made the following recommendations:

a. The board of directors of Trailer Train should reaffirm that the basic principles of the company are to provide railroad equipment and related services to users at the lowest level of charges and to maintain a rate policy which will provide sufficient return to cover all costs and to enable the financing of fleet growth;

b. The board of directors should authorize the finance committee to retain a firm of independent investment bankers to determine the value of a block of 500 shares of the company's stock;

c. The finance committee, on the basis of this valuation, should determine whether to commence negotiations with the two bankrupt, non-user shareholders (Reading and the Erie Lackawanna) toward acquisition of their shares. (Exh. 27, 28)

52. In accordance with the recommendations contained in the reports of Paul, Weiss and Morgan Stanley, dated November 21, 1979, the Trailer Train board of directors adopted a resolution on November 29, 1979, which provided in pertinent part:

NOW, THEREFORE, BE IT

RESOLVED that this Board of Directors hereby determines and reaffirms that

(A) the basic principles and objectives of the Corporation have been, are and shall continue to be

—to provide railroad equipment and services to users at the lowest level of charges; and

—to maintain a rate policy, with the approval of the Board of Directors, which will provide sufficient return to cover all costs and to enable the financing of authorized fleet growth on reasonable terms; and

(b) the common stock of the Corporation has never been, is not and shall not be an investment vehicle, and the Corporation has never had, does not have and shall not have goals of maximizing profits, paying dividends or providing share-

holders with a market for their shares or a means of realizing a profit on their investment;

RESOLVED that the Finance Committee of the Board of Directors is hereby authorized and directed to retain a firm of investment bankers to determine the value of a block of 500 shares of the Corporation's common stock;

RESOLVED that, if the common stock of the Corporation owned by the two bankrupt shareholders of the Corporation which are currently unable to utilize the Corporation's equipment (the Reading Company and the Erie Lackawanna Railroad Company) could be acquired on a basis which is both consistent with the Corporation's basic principles and objectives and economically practicable for the Corporation, it would be in the best interest of the Corporation to acquire such shares;

(Stip. No. 64; Tr. 19, 113)

53. Thirty-one directors voted in favor of the resolution of November 29, 1979, including Charles M. Donovan, the director nominated by Reading; two directors voted against the resolution; four directors abstained; and four directors were absent from the vote. (Tr. 113; Exh. 63)

54. The vote on the November 29, 1979, resolution among those directors present and voting was as follows:

(a) Directors nominated by the largest nine users: all voted in favor of the resolution;

(b) Directors nominated by the middle nine users: 8 directors voted; 7 directors voted in favor of the resolution; 1 director voted against the resolution;

(c) Directors nominated by the smallest nine users (including Reading and two other non-users); 7 directors voted, 6 directors voted in favor of the resolution; 1 director voted against the resolution. (Stip. No. 66)

55. Charles Donovan, the Reading nominee on the board of directors, voted in favor of the resolution for two reasons:

a. He assumed that the resolution's purpose was to reaffirm Trailer Train's basic policies *vis a vis* only those shareholders operating a railroad.

b. The resolution called for the valuation of the stock which would provide the basis for Trailer Trains acquisition of Reading's shares. (Tr. 445–46)

56. Pursuant to the resolution of November 29, 1979, Trailer Train retained Morgan Stanley on December 21, 1979, to determine the value of a block of 500 shares of the company's common stock. (Tr. 114, 236, 246–47)

57. The results of the Morgan Stanley valuation study were submitted to Trailer Train in a report dated March 20, 1980. This report was distributed to each director of Trailer Train on March 21, 1980. (Stip. No. 68; Tr. 114, 237)

58. Morgan Stanley arrived at a fair market value of $1.5 million for a 500 share block of Trailer Train stock. (Exh. 30; Tr. 114, 248–61)

59. This valuation was premised in large measure upon the assumption that there exists little or no public market for the stock because of the company's policies of not maximizing profits and not paying dividends. (Tr. 19, 251–52, 254–55)

60. On March 5, 1980, the finance committee of Trailer Train adopted the following resolution:

RESOLVED, That this Finance Committee hereby determines, in light of the opinion of Morgan Stanley & Co. Incorporated reported to this Committee today, to commence, on behalf of the Company, negotiations with the two bankrupt, non-user shareholders of the Company toward the acquisition of their shares on a basis which is both consistent with the Company's basic principles and objectives, as determined and reaffirmed by the Board of Directors on November 29, 1979, and economically practicable for the Company; and

RESOLVED, That the President of the Company, and such other officers and agents of the Company as he shall designate, are hereby authorized and directed to conduct such negotiations under the directions of this Committee; and

RESOLVED, That no commitment for the acquisition of any shares of this Company from such two bankrupt, non-user shareholders shall be binding upon the Company unless and until it shall have been approved by resolution of the Company's Board of Directors.

(Stip. No. 69; Tr. 114)

61. The consolidated net worth of Trailer Train and its wholly owned subsidiaries as of December 31, 1979, was in excess of $328 million; (Tr. 253) Reading's *pro rata* share of the company was $8,003,300.00.

## DISCUSSION

■ This action arises from the conflict of two competing interests which have long been recognized and protected under Delaware law.[2] In tension are the right of a majority of a corporation's shareholders to vote its shares and set corporate policy, *see Ringling Bros.—Barnum & Bailey Combined Shows, Inc. v. Ringling,* 29 Del.Ch. 610, 622, 53 A.2d 441, 447 (Del.1947), and the important qualification that in doing so, the majority owes a fiduciary duty of fairness to its "associates of the minority" *Allaun v. Consolidated Oil Co.,* 16 Del.Ch. 318, 324, 147 A. 257, 260 (1929). The parties' contentions reflect this conflict.

Trailer Train argues that the actions of its board of directors must be evaluated under the business judgment rule. Using this standard, the board's decisions will be validated unless Reading can show that they were not based upon any "rational business purpose." *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971). It is contended that the board's position in this matter, as exemplified by its November 29, 1979, resolution and subsequent offer of $1.5 million for Reading's stock, is derived from its long-established policy of refusing to operate the company as a profit-maximizing enterprise. This policy, in turn, permits Trailer Train to fulfill its fundamental corporate purpose of providing its user-shareholders with equipment at the lowest possible cost. Thus, Trailer Train argues that its policies are in the best interests of both the company and the majority of its shareholders and, therefore, cannot be invalidated simply because they are detrimental to Reading.

By contrast, Reading contends that the board's actions must be evaluated by a stricter standard—whether they are intrinsically fair to Reading as a minority shareholder unable to benefit from its stock ownership under existing corporate policies. This argument is predicated upon the assertion that Trailer Train's corporate processes are controlled by those shareholders who most benefit from using Trailer Train equipment. Because of the policies which result from this control, the corporation is used as a vehicle to further the interests of its majority shareholders thereby precluding Reading from obtaining any benefit from its stock ownership. Under these circumstances, it is contended, the board's actions must be evaluated under the "intrinsic fairness" standard.

■ I have carefully considered the parties' positions as well as the policy considerations which weigh in favor of each. While this case presents an unusual variation on the standard situation where a dominant shareholder unilaterally dictates corporate policy for its own benefit and to the detriment of the minority shareholders and possibly the corporation, I am convinced that the combination of Reading's minimal percentage ownership, its inability to derive any benefit from its investment under existing corporate policies, and the complete illiquidity of Trailer Train's stock, brings this action within the ambit of those Delaware cases which have imposed a fiduciary obligation of fairness upon majority shareholders. Accordingly, I conclude that "a Delaware court would not undertake the hollow intellectual exercise of measuring [Trailer Train's actions] by a decidedly

---

**2.** Because the petition implicates the internal affairs of a Delaware corporation, Reading's right to relief is governed by Delaware law. *See Coleman v. Taub,* 638 F.2d 628, 629 n. 1 (3d Cir.1981). In recognition of this principle, the parties have stipulated that Delaware law controls the disposition of this matter.

weaker standard, the business judgment test." *Harriman v. E.I. Du Pont deNemours and Co.,* 411 F.Supp. 133, 153 (D.Del. 1975). I further hold that the Board's actions have precluded Reading from obtaining a fair return on its stock ownership and therefore constitute a breach of its obligation to treat Reading fairly.

Before further addressing this issue, it is necessary to delineate precisely the manner in which Trailer Train's majority shareholders have breached their fiduciary obligation to Reading. To a certain extent, this result is inherent in Trailer Train's corporate structure. The company was formed, and its stock purchased, only by railroads which desired to obtain access to its fleet of railroad cars at the lowest possible cost. Thus, Trailer Train is little more than a vehicle to advance the business purposes of its constituent shareholders and it necessarily has no corporate "best interest" apart from its utility to them.[3] Viewed in this context, I cannot say that, as a general matter, Trailer Train's policies do not have a legitimate business purpose. However, I cannot accept the company's assertion that Reading's petition constitutes a broad-based challenge to the majority stockholders' right to vote their shares and set corporate policy. The validity of the policies by which Trailer Train has chosen to conduct its business operations is not challenged *in toto.* What is at issue is whether the policy, *as applied to Reading,* unfairly deprives Reading of its ability to obtain a return on its investment and whether Trailer Train's board of directors has a responsibility to allow Reading to obtain a return comparable to that received by those shareholders which use the company's equipment. Both questions must be answered in the affirmative.

■ In *Guth v. Loft, Inc.,* 23 Del.Ch. 255, 5 A.2d 503 (1939), the Delaware Supreme Court comprehensively set forth the duty of loyalty owed by directors to the corporation they serve:

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

*Id.* at 270, 5 A.2d at 510. The majority or controlling shareholders in a corporation owe a comparable duty of loyalty and fairness to the minority shareholders. *David J. Greene and Co. v. Dunhill International, Inc.,* 249 A.2d 427, 434 (Del.Ch. 1968); *Allied Chemical & Dye Corp. v. Steel & Tube Co. of America,* 14 Del.Ch. 1, 12–13, 120 A. 486, 491 (1923). The imposition of this duty derives from the "profound knowledge of human characteristics and motives" described in *Guth, supra*—"where a director or controlling stockholder stands to benefit personally from the decision as a director or controlling stockholder, his or her business judgment is likely to be affected by personal interest." Arsht, *The Business Judgment Rule Revisited.* 8 Hofstra Law Review 93, 115 (1979). In such a circumstance, the law requires that the majority's actions be "intrinsically fair" to those in the minority.

---

**3.** In this respect, "the sole or primary motive" of the majority shareholders unquestionably is to benefit themselves to the exclusion of the minority shareholders, although not necessarily to the detriment of the corporation itself. *See Johnson v. Trueblood,* 629 F.2d 287 (3d Cir. 1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981).

The Delaware courts have thus protected the interests of minority shareholders in a wide variety of contexts. In *Sterling v. Mayflower Hotel Corp.*, 33 Del.Ch. 293, 93 A.2d 107 (1952), Hilton Hotels acquired over 80 percent of Mayflower's outstanding stock. Wishing to merge the two entities, Mayflower's Hilton-controlled board of directors approved an exchange of stock at a set conversion ratio. The court held that since Hilton was Mayflower's controlling shareholder and "[stood] on both sides of the transaction," it bore the burden of establishing the "entire fairness" of the merger to Mayflower's minority shareholders. *Id.* at 298, 93 A.2d at 110. Similarly, in *Bennett v. Breuil Petroleum Corp.*, 34 Del.Ch. 6, 99 A.2d 236 (1953), a majority shareholder caused the board of directors to adopt a charter amendment doubling the number of the company's approved shares, issuing them at a greatly reduced par value, and effectively eliminating the stockholders' preemptive rights. This had the effect of greatly diluting the interest of a minority shareholder. The court held that actions by a majority shareholder having as their primary purpose the impairment of the minority shareholder's interest in the enterprise were actionable. *Id.* at 12, 99 A.2d at 239. *See also Petty v. Penntech Papers, Inc.*, 347 A.2d 140 (Del.Ch.1975) (selective redemption of preferred stock designed to perpetuate management's control of company); *Schnell v. Chris-Craft Industries, Inc.*, 285 A.2d 437 (Del.1971) (management advanced date of annual stockholder's meeting in order to obstruct proxy contest); *David J. Greene and Co. v. Dunhill International, Inc., supra,* (merger of parent and subsidiary); *Condec Corp. v. Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769 (1967) (issuance of new stock to defeat minority shareholders takeover bid):[4]

These principles were applied in the seminal case of *Singer v. Magnavox Co.*, 380 A.2d 969 (Del.1977), in which the Delaware Supreme Court held that a straight cash-for-stock merger that had as its sole purpose the elimination of minority stockholders was an abuse of the corporate process. The court's decision was premised upon the fundamental principle that a majority shareholder may not legitimately use the corporate process for the sole purpose of removing minority stockholders from continued participation in the enterprise. *See Id.* at 980. This holding was refined in *Tanzer v. International General Industries, Inc.*, 379 A.2d 1121 (Del.1977), which addressed an issue left unresolved in *Singer* —whether the cash-out of minority shareholders in a subsidiary is permissible when the merger advances a valid business purpose of the parent. In deciding this question, the court was forced to accommodate the interests which are in tension here—the fundamental right of a majority shareholder to vote its shares versus the minority's right to be treated fairly by those who control the corporation. The court held that if a merger is effected to further a legitimate business purpose of the parent, it is not *per se* an abuse of the corporate process. However, the majority still retains the burden of establishing the merger's "entire fairness" to the minority. *Id.* at 1125.

■ These principles are dispositive of the present case. The invocation of the intrinsic fairness standard is predicated upon the existence of two factors: majority

---

4. In a related context, the Delaware Supreme Court applied an analogy to the intrinsic fairness test in determining the circumstances under which an independent committee appointed by the Board of Directors can be authorized to terminate a shareholders' derivative suit if the suit were found to be inimical to the corporation's best interests. *See Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981). The court held that such a determination does not rest solely with the business judgment of the Committee. Rather, it is subject to a two step review by the court. First, the court must inquire into the independence and good faith of the committee and the bases of its recommendation. Second, the court must apply its own independent business judgment to evaluate the Committee's recommendation. *Id.* at 788–89. In promulgating this standard, the court expressly noted "[o]ur approach here is analagous to and consistent with the Delaware approach to 'interested director' transactions, where the directors, once the transaction is attached, have the burden of establishing its 'intrinsic fairness' to the court's careful scrutiny." *Id.* at 788–89 n. 17.

control and domination and majority self-dealing. *See Trans World Airlines, Inc. v. Summa Corp.*, 374 A.2d 5, 10 (Del.Ch.1977); *Harriman v. E.I. Du Pont deNemours and Co., supra,* 411 F.Supp. at 152. The concept of control and domination has been defined as "a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Kaplan v. Centex Corp.,* 284 A.2d 119, 123 (Del.Ch.1971). Trailer Train argues that its corporate processes are not controlled by a single dominant stockholder and that, although the vast majority of its stock is owned by railroads which use Trailer Train equipment, the interests of these user-shareholders are so diverse as to preclude any possibility that they act as a single cohesive unit. Specifically, Trailer Train points to the question of ownership-use disparity. Trailer Train contends that although Reading is one of the very few non-user shareholders, many of the other shareholders', use of Trailer Train equipment is so disproportionately small in relation to their equity that their interests are identical to Reading's. Thus, Trailer Train argues that its shareholders do not act with sufficient unity of purpose to constitute a discernible majority which unilaterally dictates the actions of the board of directors.

I do not agree. Over 90 percent of Trailer Train's outstanding stock is owned by railroads which use Trailer Train equipment and which are benefitted to some extent by the continuation of corporate policies that make equipment use the sole benefit of stock ownership. Thus, although there may be a difference in the *extent* to which each user-shareholder benefits from present corporate policies, there is no question that each can and does benefit and therefore each has some interest in the continuation of these policies. In addition, each has a potential for greater benefit that is only limited by its ability to generate additional business. Whatever differences in emphasis there may be among Trailer Train's op-

erating railroad shareholders because of their disparity of use, their tracks are parallel, headed somewhere. Their differences with each other are of degree. Their difference with Reading is of kind. Reading is absolutely precluded from obtaining *any* return on its stock ownership by virtue of the majority's policies and it is on a dead-end siding, going nowhere. Moreover, Reading owns only 2.44 percent of Trailer Train's outstanding stock and it has only one representative on a 37 member board of directors. Therefore, it cannot possibly alter the company's present practices through internal corporate procedures because its voting power is inconsequential. Before this suit was brought, Reading tried by negotiation and persuasion to obtain a change in Trailer Train's policies, but to no avail. The domination and control by those whose interests are the opposite of Reading's is obvious, absolute, and unchanging.

The second element required for the invocation of the intrinsic fairness test, self-dealing, is present when the dominant party derives benefits in which the minority shareholders are denied the right to participate. *Trans World Airlines, Inc. v. Summa Corp., supra,* 374 A.2d at 9. That element is present here. By making use of Trailer Train equipment the sole benefit of stock ownership, the board of directors has effectively permitted the company's user-shareholders to obtain a benefit which is not available to non-users,[5] Reading and Erie Lackawanna. Thus, the company's user shareholders have used its corporate processes to benefit themselves while at the same time they have denied any benefit to the non-user shareholders. In addition, Trailer Train's stock cannot be sold. Thus, unlike dissatisfied shareholders in many corporations, Reading does not have the easy option of just selling out. It is effectively locked into an investment which provides no return and in which what is accepted as the interests of the majority completely obliterate its own. Trailer Train's

---

**5.** Anomalous as it may be, even though Reading cannot benefit from its stock ownership, non-shareholder, operating railroads can bene-

fit from Trailer Train because they can use its equipment at the same rates charged to shareholders. *See Finding of Fact* No. 17.

corporate policy constitutes self-dealing within the meaning of the Delaware cases.

■ Because the requisite elements of domination and control, and self-dealing are present in this case, I conclude that the board of director's actions must be evaluated to determine if they are intrinsically fair to Reading. I can only conclude that the board's policies fall far short of this standard and therefore constitute a breach of its fiduciary obligation of fairness. The essence of this obligation was aptly summarized by Vice Chancellor Brown in *Weinberger v. UOP, Inc.*, 409 A.2d 1262, 1265 (Del. Ch.1979).

> The rationale underlying the decisions in *Singer* and *Tanzer* is deeply rooted in our corporate law. It is based upon the principle that whenever a majority shareholder, or a group of shareholders who combine to form a majority, undertakes to exercise an available statutory power so as to impose the will of the majority upon the minority, such action gives rise to a fiduciary duty on the part of the majority shareholder to deal fairly with the minority whose property interests are thus controlled.

A fundamental aspect of this fiduciary obligation is the right of the minority to participate *pro rata* in the returns of the enterprise. *Southern Pacific Co. v. Bogert,* 250 U.S. 483, 487–88, 39 S.Ct. 533, 535, 63 L.Ed. 1099 (1919). *See also* Note, *Fiduciary Duties of Majority or Controlling Stockholders,* 44 Iowa Law Review, 734, 738–39 (1959). The crux of this case is that the sole return on Trailer Train's stock ownership is access to the company's fleet of railroad cars. Reading is precluded from obtaining this benefit because it no longer has use for these cars. Under the circumstances present here, it is incumbent upon the board of directors and majority stockholders of Trailer Train to permit Reading to obtain some benefit from stock ownership. A review of the record reveals that this has not been done.

■ Trailer Train argues that it has fulfilled its obligation to Reading in two respects. First, it contends that Reading has obtained a fair return on its investment by virtue of having access to the company's fleet of cars from 1961, when Reading first became a stockholder, until 1976, when its rail assets were conveyed to Conrail. This argument begs the question. No one disputes that while Reading was in the railroad business, it benefitted from its stock ownership. The dispositive point, however, is that since 1976, Reading has not had use for Trailer Train's fleet of railroad cars and has therefore not obtained any return on its equity interest in the company. Thus, merely because Reading benefitted at one time does not alter the fact that it has not received any return on its investment for six years.

■ Trailer Train's more substantial contention is that it has fulfilled its fiduciary duties to Reading. Specifically, it points to the "substantial, continuing, and costly efforts" to solve the problem which culminated in the Morgan Stanley study and the offer of $1.5 million for Reading's stock. The short answer to this contention is that despite these efforts, Reading has not derived any substantive benefit from its stock ownership since 1976.[6] Moreover, as will be discussed in more detail below, the $1.5 million offer is based upon an inappropriate measure of valuation and therefore does not reflect adequately the value of Reading's equity interest in Trailer Train. Thus, I am compelled to conclude that Trailer Train has breached its fiduciary allegation to allow Reading to obtain a benefit from its stock ownership which is comparable to that being received by the company's user shareholders. I turn now to the choice of remedy.

■ After careful consideration, I conclude that the most appropriate form of relief is to require Trailer Train to repurchase Reading's stock at fair value. Al-

---

**6.** He who strikes out strikes out, however much he may have stirred up the air by his efforts.

though there is no mandatory buy-out provision in the Form A car contract, under Delaware law the company is unquestionably authorized to repurchase its outstanding stock subject to several qualifications not relevant here. 8 Del.Code Ann. § 160. *See also* Folk, The Delaware General Corporation Law at 154 (1972) ("so long as it abides by certain restrictions, chiefly found in the caselaw, a corporation may freely purchase its outstanding stock"). There are alternatives to the buy-out remedy, i.e., the issuance of a class of dividend paying stock, but the practical problems which inhere in each make the compelled reacquisition of Reading's stock by Trailer Train the most appropriate way to resolve this dispute. *See* generally, Hetherington and Dooley, *Illiquidity and Exploitation: A Proposed Statutory Solution to the Remaining Close Corporation Problem.* 63 Va.Law Rev. 1, 50–62 (1977).[7]

This does not, however, solve the problem of what constitutes fair value for the stock.

■■■ Trailer Train's theory of valuation is nothing more than the fair market value of the stock under the company's existing policies. This valuation necessarily recognizes that because Trailer Train does not seek to maximize profits and does not permit a direct monetary return on its shares, the market for its stock is limited to only one railroad which might benefit from access to the company's fleet of cars. The shortcomings of this approach are obvious. By predicating the stock's value solely upon its very limited market, Trailer Train completely ignores that by virtue of its ownership interest in the company, Reading is entitled to its proportionate share of the company's assets. *See, generally,* Note, *Valuation of Dissenter's Stock Under Appraisal Statutes,* 79 Harvard Law Review 1453, 1457 (1966). Whether viewed in terms of liquidation value or net asset value, Reading's rightful claim to a *pro rata* portion of Trailer Train's assets cannot be

ignored in determining the fair value of its stock. Because Trailer Train's proposed valuation does precisely that, it is rejected.

Reading's valuation suffers from flaws which are equally fundamental. Its theory is predicated on the fact that the rates charged by Trailer Train for the use of its equipment are lower than the per diem rates mandated by the I.C.C. for railroads. Reading contends that the saving in rates which each shareholder receives by using Trailer Train equipment constitutes a "constructive dividend" and that it is therefore entitled to 2.44 percent of total savings from 1976, when it transferred its stock to Conrail, up to December 31, 1979, plus the same percentage for projected savings for the ten year period from 1980 to 1990. I cannot accept this valuation. To begin with, the evidence clearly showed that Trailer Train's rates were set on the basis of a complex formula which did not take into account the prevailing level of I.C.C. rates. Further, there was nothing in the record which would support a finding that the I.C.C. will continue to use a formula which would keep prevailing per diem rates above those set by Trailer Train. Thus, to the extent that Reading attempts to project a constructive dividend over a ten year period, its calculations are far too speculative to support a claim of entitlement to a pro-rata share of those projections.

Although Reading's claims to a constructive dividend for the period 1976 through 1979 are based upon actual rate differentials during that period and are therefore not speculative, the return which each shareholder obtained was predicated upon *use* of the company's equipment and not upon proportionate equity ownership. Thus, it is misleading for Reading to base its claim upon its 2.44 percent ownership interest when the extent of any shareholder's return of this constructive dividend is

---

7. The principal problem with any of the proposed remedies which do not call for an outright repurchase of the stock for cash or a subordinate debt instrument is the impracticability of computing annually, what Reading is

entitled to. Quite simply, there is no realistic way of quantifying, on an annual basis, the largely intangible benefits which flow from stock ownership.

predicated solely upon use. For this reason, I am unable to accept Reading's valuation as a basis for ascertaining the fair value of its stock.

A review of the record reveals that Trailer Train itself has set book value as the appropriate measurement of the stock's value. A railroad which wishes to become a shareholder must pay book value for its block of 500 shares. *Finding of Fact* No. 10. Moreover, a shareholder which wishes to sell its shares must first tender them to the corporation for repurchase at book value. *Finding of Fact* No. 16. Thus, Trailer Train has itself designated book value as the price of a block of its stock when its sale or purchase is contemplated. I conclude that book value is the fairest way to value Reading's stock. Because the current book value of a block of the company's stock was not placed on the record, I will order the parties to confer and, if possible, stipulate as to current book value. If such a stipulation cannot be made, I will schedule a supplemental hearing and determine the stock's value on the basis of the evidence presented.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction under the Bankruptcy Act over the matters raised in Reading's petition for the reasons stated in *In re Reading Co.*, 2 B.R. 719 (Bkrtcy.E.D. Pa.1980).

2. The Board of Directors and majority shareholders of Trailer Train owe a fiduciary duty of fairness to Reading.

3. In failing to permit Reading to obtain a monetary return from its stock ownership comparable to the benefits received by its user-shareholders, Trailer Train breached its fiduciary obligation of fairness.

4. The most appropriate relief is to require Trailer Train to repurchase Reading's stock at current book value.