OPINION OF THE COURT
 

 JAMES HUNTER, III, Circuit Judge:
 

 Appellee Reading Company (“Reading”) owns 500 shares of stock in appellant Trailer Train Company (“Trailer Train”). During Reading’s reorganization proceedings under section 77 of the Bankruptcy Act of 1898 as amended (“the 1898 Act”), 11 U.S.C. § 205 (1976),
 
 [1]
 
 Reading’s trustees petitioned for an order compelling Trailer Train to repurchase the stock, convert it into debt or preferred stock, or pay dividends. The United States District Court for the Eastern District of Pennsylvania, sitting as a reorganization court, ordered Trailer Train to repurchase the stock at book value.
 
 See In re Reading Co.,
 
 551 F.Supp. 1205 (E.D. Pa.1982). Trailer Train appeals. We will reverse.
 

 I
 

 For many years prior to April 1, 1976, Reading ran an interstate railroad. On November 21, 1971, Reading entered into reorganization under section 77 of the 1898 Act. On April 1, 1976, pursuant to the Regional Rail Reorganization Act of 1973, 45 U.S.C. §§ 701-797m (1976 & Supp. V 1981), Reading conveyed its rail properties to the Consolidated Rail Corporation (“Conrad”) and discontinued all rail operations. Reading emerged from reorganization on January 1, 1981. It has not reentered the railroad business.
 

 Trailer Train was incorporated in 1955 by the Pennsylvania Railroad and others for the sole purpose of facilitating inter-railroad “piggyback” shipments by establishing a pool of standardized railroad flat cars. 551 F.Supp. at 1207;
 
 see
 
 app. at 1334. From an initial fleet of 500 cars, by 1979 Trailer Train had grown to own, operate, and maintain 87,494 intermodal (piggyback), autorack, and special use cars, approximately ninety percent of those in use in the country.
 
 See
 
 app. at 1334. Those cars are used by railroads in the United States under a pooling agreement entered
 
 *513
 
 into between Trailer Train and its shareholders with the approval of the Interstate Commerce Commission (“the ICC”). American
 
 Rail Box Gar Co.
 
 — Pooling, 347 I.C.C. 862 (1974). To participate in the pool, a railroad must purchase a 500-share block of stock and sign Trailer Train’s Form A Car Contract. Any shareholder railroad, no matter how many blocks of stock it owns, is then entitled to use the cars from the pool on its own lines, and to interchange the cars with other shareholder railroads or with non-shareholder railroads.
 

 Shareholder and non-shareholder railroads in possession of Trailer Train cars must pay car hire charges set by the Trailer Train rate policy. That policy, which Trailer Train has adhered to throughout its corporate existence, is set forth as part of the Form A Car Contract:
 

 It shall be the policy of Trailer Train to maintain per diem, mileage and other charges at the lowest level required to meet Trailer Train’s ordinary and necessary expenses, ... and to accumulate retained earnings adequate to support continued reasonable enlargement of the number of cars in the pool, to that number found to be needed. It is the intention [of Trailer Train and each of its shareholders] that the total compensation paid to Trailer Train .. . shall be no greater than consistent with the foregoing policy.
 

 551 F.Supp. at 1210. Thus, under its rate policy, Trailer Train does not try to maximize its profits. Instead, it tries to minimize the rates paid by its shareholders. In consequence, Trailer Train has never paid a dividend to its shareholders. The only benefit of owning Trailer Train stock is access to its large pool of standardized cars in return for payment of Trailer Train’s car hire rates.
 

 From 1956 to 1969, the aggregate car hire rates paid by shareholders for the use of Trailer Train cars were higher than the rates which those shareholders would have paid under the ICC per diem schedule had they chosen instead to use their own cars on other railroads’ lines. In 1969 the ICC changed the formula by which it calculated its per diem rates. As a result, since 1969 the aggregate car hire rates paid by most shareholders for the use of most Trailer Train equipment have been lower than the rates which those shareholders would have paid under the ICC per diem schedule.
 

 Between 1955 and 1964 forty operating railroads bought blocks of shares in Trailer Train. Since 1964 there have been no sales of stock except through combinations or reorganizations of existing shareholders. At present thirty operating railroads, representing approximately eighty-nine percent of the mileage of class 1 railroads in the United States, now own stock in Trailer Train. The other shareholders are a diversified freight forwarding company, Reading, and the trustees of the Erie Lackawan-na Railway, which like Reading entered reorganization, conveyed its rail properties to Conrail and left the railroad business.
 

 In 1961 Reading acquired its block of Trailer Train stock at the book value of $150,105.
 
 [2]
 
 At that time Reading signed the Form A Car Contract. In addition, Trailer Train informed Reading that
 

 the car contract requires Trailer Train Company to set per diem and other charges on a basis that will enable the company to meet its expenses and to finance its car acquisitions without, however, yielding excessive profits to Trailer Train Company.
 

 App. at 128. From 1961 to 1976, Reading used Trailer Train flat cars in rail service and paid car hire charges. Reading never challenged Trailer Train’s rate policy while it was an operating railroad. App. at 300-02. Indeed, while in reorganization Reading joined with the other shareholders in requesting approval of the pooling arrangement from the ICC, which endorsed Trailer Train’s financial policy.
 
 American Rail Box Car Co.
 
 —Pooling, 347 I.C.C. 862, 907-08 (1974).
 

 
 *514
 
 When Reading transferred its rail properties to Conrail in 1976, Reading’s trustees successfully requested that its Trailer Train stock not be transferred. App. at 130-31. The trustees did so because in their view the stock “was a valuable asset of the Reading Estate which would eventually produce substantial value for its creditors and stockholders.” App. at 271-72. Since, its cessation of rail operations, however, Reading has been unable to derive any benefit from its ownership of the stock.
 

 After offering its stock to Trailer Train for repurchase at book value,
 
 [3]
 
 Reading’s trustees tried to sell the stock but found that there was no demand for it. The trustees subsequently discussed with Trailer Train the possibility that the latter might change its dividend policy, repurchase the stock at book value, or exchange it for newly-created debt instruments reflecting Reading’s proportionate ownership. Trailer Train told Reading’s trustees that its board of directors was opposed to such changes in its policy of operations.
 

 On February 1, 1978, Reading’s trustees filed a petition in its reorganization proceedings. The petition alleged that as a result of the Regional Rail Reorganization Act, Reading was no longer able “to profit from its membership in [Trailer Train].” App. at 12; Until that “problem” was solved, the trustees stated, they could not finalize or file a plan of reorganization. App. at 13. The trustees requested that the court order Trailer Train to negotiate a solution to the problem.
 

 Trailer Train moved to dismiss the petition, arguing that the reorganization court lacked jurisdiction in a summary proceeding to decide the issues raised. Such issues, Trailer Train contended, had to be litigated in a plenary suit in a court of appropriate jurisdiction. On January 12,1979, the court denied Trailer Train’s motion. The court held that it had jurisdiction and ordered the parties to negotiate. App. at 23-26. On January 4, 1980, the reorganization court again rejected Trailer Train’s renewed argument that the court had no jurisdiction.
 
 In re Reading Co., 2
 
 B.R. 719 (D.C.E.D.Pa. 1980).
 

 After initial negotiations proved fruitless, the Reading trustees filed an amended petition requesting an order to compel Trailer Train either to purchase the stock at book value, or to convert it into interest-bearing debt instruments or dividend-paying preferred stock. Reading’s trustees subsequently filed a second amended petition in which they asserted that Trailer Train’s policies constituted a breach of fiduciary duty to Reading as a minority stockholder. The petition suggested that the court direct Trailer Train to pay dividends on the stock or to pay a share of the savings realized by pool users on account of Trailer Train’s lower car hire rates.
 
 [4]
 

 On August 11, 1982, the court below held that Trailer Train had breached its fiduciary duty to Reading, and granted Reading’s petition to compel Trailer Train to repurchase the stock at current book value.
 
 In re Reading Co.,
 
 551 F.Supp. 1205 (E.D.Pa.1982). After the parties stipulated that the stock’s current book value was $9,830,707, the court entered a judgment ordering Trailer Train to pay the stipulated price upon the tender of the stock by Reading. App. at 221.
 

 II
 

 On appeal Trailer Train argues that the district court lacked summary jurisdiction
 
 *515
 
 as a reorganization court to hear Reading’s petition as amended. Trailer Train also disputes that it breached any fiduciary duty owed to Reading as a minority shareholder.
 
 [5]
 

 A.
 
 Jurisdiction
 

 The court below held that it had jurisdiction to hear the trustees’ claim both as a reorganization court and as a district court sitting in diversity. We hold that the court below did not have jurisdiction to decide the claim as a reorganization court. We hold, however, that the court did have jurisdiction to decide the claim as a district court sitting in diversity, and that the court extended to Trailer Train all the procedural protections required in such a civil action.
 

 Section 2(a)(7) of the 1898 Act invests a bankruptcy court with jurisdiction to determine controversies relating to a bankrupt’s estate. 11 U.S.C. § 11(a)(7) (1976). Section 77(a) of the 1898 Act provides that a railroad reorganization court shall “have exclusive jurisdiction of the debtor and his property wherever located.” 11 U.S.C. § 205(a) (1976). Under those sections a reorganization court has summary jurisdiction to adjudicate controversies relating to property over which it has actual or constructive possession.
 
 Thompson v. Magnolia Petroleum Co.,
 
 309 U.S. 478, 481, 60 S.Ct. 628, 629, 84 L.Ed. 876 (1940). A reorganization court has actual possession over tangible property in the hands of the court’s officers, and constructive possession of tangible or intangible property in the possession of the bankrupt when the petition in bankruptcy is filed.
 
 Taubel-Scott-Kitzmiller Co. v. Fox,
 
 264 U.S. 426, 432-33, 44 S.Ct. 396, 398-99, 68 L.Ed. 770 (1924); 2 J. Moore & R. Oglebay, Collier on Bankruptcy ¶ 23.05 (14 ed. 1976) [hereinafter cited as “Collier”]. Jurisdiction over such property is characteristically “summary” because the claims are resolved in informal proceedings, free of the formal procedural rules which would attend a “plenary” civil adjudication.
 
 See
 
 2 Collier ¶ 23.02, at 439-42.
 

 If the reorganization court lacks possession over property claimed by the trustee, it generally has no summary jurisdiction to consider the trustee’s claim if a third party asserts a bona fide and substantial claim to the property. The third party “has the right to have the merits of his claim adjudicated ‘in suits of ordinary character, with the rights and remedies incident thereto.’ ”
 
 Cline v. Kaplan,
 
 323 U.S. 97, 98-99, 65 S.Ct. 155, 156-157, 89 L.Ed. 97 (1944) (quoting
 
 Galbraith v. Vallely,
 
 256 U.S. 46, 50, 41 S.Ct. 415, 416, 65 L.Ed. 823 (1921)). If the third party does not consent to the jurisdiction of the reorganization court, section 23(b) of the 1898 Act requires that the trustee bring his claim only in a court where the bankrupt could have brought the claim if bankruptcy proceedings had not been initiated. 11 U.S.C. § 46(b) (1976).
 

 Reading maintains that at the time it entered reorganization it possessed the Trailer Train stock and the rights of an owner of that stock. The court below properly characterized Reading’s claimed possession as a chose in action, of which Trailer Train was the alleged obligor. A chose in action may be the “property” of the debtor within the meaning of section 77(a),
 
 Baker v. Gold Seal Liquors, Inc.,
 
 417 U.S. 467, 471 n. 7, 94 S.Ct. 2504, 2507 n. 7, 41 L.Ed.2d 243 (1974), and therefore within the constructive possession of the reorganization court.
 
 In re Lehigh Valley Railroad,
 
 458 F.2d 1041, 1043 & n. 3 (3d Cir.1972). The reorganization court thus has summary jurisdiction to determine the title to such a chose in action and, if the chose in action belongs to the estate, to prevent any interference with its use by the trustee.
 
 Gardner v. New Jersey,
 
 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947);
 
 In re Lehigh & Hudson Railway,
 
 468 F.2d 430, 433 (2d Cir.1972);
 
 Lehigh Valley Railroad,
 
 458 F.2d at 1044-45.
 

 In this case, however, the reorganization court claimed summary jurisdiction
 
 *516
 
 not to secure the chose in action for the estate, but to
 
 enforce
 
 the chose in action and thus secure for the estate other property, the $9,830,707, held by Trailer Train when Reading entered reorganization. Such an exercise of summary jurisdiction to compel the obligor of a chose in action to perform “can proceed only on the notion that not only the obligation is property of the bankrupt, but that its performance is also such before it has been performed.”
 
 In re Roman,
 
 23 F.2d 556, 558 (2d Cir.1928). Such an assumption is warranted only where the obligor of the chose in action does not dispute the existence and the amount of his obligation to the debtor.
 
 Lehigh Valley Railroad,
 
 458 F.2d at 1043-44; see
 
 In re Penn Central Transportation Co.,
 
 477 F.2d 841, 844 (3d Cir.),
 
 aff’d in part,
 
 414 U.S. 885, 94 S.Ct. 231, 38 L.Ed.2d 137,
 
 cert. denied in part,
 
 414 U.S. 923, 94 S.Ct. 219, 38 L.Ed.2d 157 (1973). Where, however, the alleged obligor raises a bona fide and substantial dispute concerning his obligation under the chose in action, the reorganization court has no summary jurisdiction; under section 23(b) the trustee must resort to a plenary action, in a court of general jurisdiction that has personal jurisdiction over the alleged obligor, in order to establish that the property sought is an asset subject to the jurisdiction of the reorganization court.
 
 Lehigh Valley Railroad,
 
 468 F.2d at 1043-44;
 
 In re Penn Central Transportation Co.,
 
 453 F.2d 520, 523 (3d Cir.),
 
 cert. denied,
 
 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972);
 
 see Lehigh & Hudson Railway,
 
 468 F.2d at 433.
 

 In its appearances before the court below, Trailer Train denied that the petition of the Reading trustees stated a claim against it, refused to consent to the resolution of the claim in summary proceedings, and rejected the reorganization court’s assertion of jurisdiction. Trailer Train’s argument that it had no obligation as a fiduciary to exchange Reading’s stock for other property certainly was bona fide and substantial. The. court below consequently had no jurisdiction as a reorganization court to adjudicate the trustees’ petition.
 

 The court below, however, held that it had jurisdiction to hear the Reading’s claim not only as a reorganization court but also as a district court sitting in diversity.
 
 [6]
 
 Section 23(a) of the 1898 Act makes clear that the United States district courts have jurisdiction over controversies between trustees in bankruptcy and adverse claimants concerning property claimed by the trustees “in the same manner and to the same extent as though such [bankruptcy] proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants.” 11 U.S.C. § 46(a) (1976). Although in this ease the trustees improperly called upon the court’s reorganization jurisdiction, their petition stated a claim over which the district court had jurisdiction under 28 U.S.C. § 1332 (1976). We therefore find that the district court had jurisdiction to hear the trustees’ claim in plenary civil proceedings.
 

 Before the court below Trailer Train protested that the invocation of summary reorganization jurisdiction would deprive it of a plenary suit in which the rules relating to pleading, discovery, and evidence would be applied. The court below assured Trailer Train that it was unimportant whether the proceeding was technically summary or plenary because the court would “proceed on the basis of notice, hearing, and all of the provisions of due process.” App. at 26. The procedural protections subsequently employed by the court
 
 [7]
 
 apparently met
 
 *517
 
 Trailer Train’s specific concerns, for on appeal Trailer Train does not argue that it was denied any procedural right. Instead Trailer Train insists only that Reading’s claim had to be adjudicated in a plenary action separate from the reorganization proceedings.
 

 An objection to the procedures employed at trial does not go to the jurisdiction of the court below,
 
 In re Universal Display & Sign Co.,
 
 541 F.2d 142, 145 (3d Cir.1976), but instead raises only a procedural right,
 
 Harris v. Avery Brundage Co.,
 
 305 U.S. 160, 164, 59 S.Ct. 131, 133, 83 L.Ed. 100 (1938). Collier on Bankruptcy states that
 

 where a defendant insists that he was entitled to a plenary mode of procedure not accorded him, and the appellate court finds that the proceeding, though called “summary” and commenced as such, actually had all or most of the requisites of the ordinary civil action and afforded the defendant a full hearing on the merits, the court will consider the proceedings as a plenary suit.
 

 2 Collier ¶ 23.02, at 442 (note omitted). We have rejected the argument of other appellants that they were deprived of a plenary proceeding where in fact “[n]o essential characteristic of a plenary proceeding was lacking.”
 
 In re Penn Central Transportation Co.,
 
 453 F.2d 520, 522 (3d Cir.),
 
 cert. denied,
 
 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972). In
 
 Penn Central
 
 the appellants were given notice, a full hearing and judicial consideration of all the testimony and argument that they chose to present.
 
 Id.
 
 In the instant case Trailer Train received no less. Given the circumstances, we conclude that the court below properly exercised its jurisdiction in diversity over the claim brought by the Reading trustees.
 

 B.
 
 Fiduciary Duty
 

 In its petition Reading contended that the Trailer Train board of directors, acting at the behest of its majority shareholders, had breached a fiduciary duty owed to Reading and other similarly-situated minority shareholders. Reading cited as the breach of duty the board’s reaffirmation of Trailer Train’s car leasing policy, its refusal to pay dividends, and its continued reinvestment of earnings in new equipment. Reading argued that Trailer Train’s continued adherence to those policies was improper given Reading’s departure from the railroad business.
 

 Reading’s claim must be judged under the law of Delaware, where Trailer Train is incorporated.
 
 Thomas v. Roblin Industries,
 
 520 F.2d 1393, 1397 (3d Cir.1975); Restatement (Second) of Conflicts §§ 306, 309 (1971). Under Delaware law, corporate directors stand in a fiduciary relationship to their corporation and its stockholders.
 
 Guth v. Loft, Inc.,
 
 23 Del.Ch. 255, 270, 5 A.2d 503, 510 (Del.1939). Similarly, a majority shareholder,
 
 or
 
 a group
 
 of
 
 shareholders who combine to form a majority, has a fiduciary duty to the corporation and to its minority shareholders if the majority shareholder dominates the board of directors and controls the corporation.
 
 Singer v. Magnavox Co.,
 
 380 A.2d 969, 976-77 (Del.1977);
 
 see Weinberger v. UOP, Inc.,
 
 409 A.2d 1262, 1265 (Del.Ch.1979);
 
 Kaplan v. Centex Corp.,
 
 284 A.2d 119, 122-23 (Del.Ch.1971). The scope and extent of the fiduciary duty depend upon the circumstances of the challenged action or inaction,
 
 see Gabelli & Co. v. Liggett Group,
 
 444 A.2d 261, 265 (Del.Ch.1982). The Delaware courts will ordinarily apply the “business judgment” rule, under which a court will not disturb the judgments of a board of directors “if they can be attributed to any rational business purpose.”
 
 Sinclair Oil Corp. v. Levien,
 
 280 A.2d 717, 720 (Del. 1971);
 
 see Gabelli,
 
 444 A.2d at 264-65; E. Folk,
 
 The Delaware General Corporation Law
 
 75-77 (1972). Where, however, the plaintiff can prove that the majority shareholder has used his control over the corporation’s board of directors to engage in self-dealing, the Delaware courts will judge the
 
 *518
 
 self-dealing action of the dominated board by the test of “intrinsic fairness.”
 
 Sinclair Oil,
 
 280 A.2d at 719-20;
 
 Warshaw v. Calhoun,
 
 43 Del.Ch. 148, 157-58, 221 A.2d 487, 492-93 (Del.1966);
 
 Chasin v. Gluck,
 
 282 A.2d 188, 192 (Del.Ch.1971). Under that standard, those asserting the validity of the corporation’s actions have “the burden of establishing its entire fairness to the minority stockholders, sufficient to ‘pass the test of careful scrutiny by the courts.’ ”
 
 Singer,
 
 380 A.2d at 976 (quoting
 
 Sterling v. Mayflower Hotel Corp.,
 
 33 Del.Ch. 293, 298, 93 A.2d 107, 109-10 (Del.1952)); accord
 
 Weinberger
 
 v.
 
 UOP, Inc.,
 
 457 A.2d 701, 710 (Del.1983).
 

 The court below held that the operating railroads formed a majority shareholder group which dominated Trailer Train’s board of directors and controlled the corporation. The court then determined that the operating railroads used that control to perpetuate Trailer Train policies which benefited operating railroad shareholders but which also prevented Reading from obtaining any return on its stock ownership. Thus finding self-dealing, the court ruled that the board’s action had to be judged under the “intrinsic fairness” standard. The court concluded that the maintenance of Trailer Train’s policies violated that standard.
 

 We may assume without deciding that the operating railroads formed a majority stockholder group and that they dominated Trailer Train’s board of directors. We believe, nonetheless, that Reading has failed to meet its burden of showing that the operating railroads engaged in self-dealing. We therefore hold that the business judgment rule is applicable, and that under the rule neither the majority shareholders nor Trailer Train’s directors have violated their fiduciary duty to Reading.
 

 Self-dealing occurs when the majority shareholders cause the dominated corporation to act in such a way that the majority shareholders receive something from the corporation to the exclusion and detriment of the minority shareholders.
 
 Sinclair Oil,
 
 280 A.2d at 720. In this case Reading retains an equal right of access to the pool cars,
 
 [8]
 
 but contends that since it is no longer a railroad, the operating railroads enjoy the
 
 use
 
 of the cars to its exclusion and detriment. The court below agreed that this was self-dealing, saying:
 

 By making use of Trailer Train equipment the sole benefit of stock ownership, the board of directors has effectively permitted the company’s user-shareholders to obtain a benefit which is not available to non-users, Reading and Erie Lacka-wanna.
 

 551 F.Supp. at 1217 (note omitted). Unlike the right of access to the pool cars, however, use of the pool cars is not extended free to all who buy stock. Use must be separately purchased by paying Trailer Train’s car hire rates. If Reading no longer has the use of the cars as a benefit, it no longer has the car hire charges as a cost. Unless the cost and benefit are not equal, and the car hire rates themselves are a reward of stock ownership, Reading has not been disadvantaged nor the operating railroads advantaged by its inability to use the cars.
 
 See Sinclair Oil,
 
 280 A.2d at 723.
 

 In its second amended petition Reading asserted that the car hire rates, to the extent they were less than the ICC per diem rates, constituted a “constructive dividend” to the operating railroads using cars from the pool.
 
 [9]
 
 Even if we assume that the
 
 *519
 
 difference between Trailer Train’s car hire rates and the ICC per diem rates constitutes a constructive dividend, Reading cannot characterize that pattern of dividend distribution as self-dealing if Reading and the other shareholders of Trailer Train have previously agreed to it. Under Delaware law the rights of stockholders are contractual,
 
 Ellingwood v. Wolfs Head Oil Refining Co.,
 
 27 Del.Ch. 356, 362-63, 38 A.2d 743, 747 (Del.1944), and may be altered by binding agreements between the stockholders and the corporation,
 
 Coleman v. Taub,
 
 638 F.2d 628, 629, 636 (3d Cir.1981) (applying Delaware law); see
 
 Weinberg v. Baltimore Brick Co.,
 
 35 Del.Ch. 225, 241, 114 A.2d 812, 821 (Del.1955);
 
 see also
 
 Del.Code Ann. tit. 8, § 350 (1975). A purchaser of stock who thus bargains away part of his rights as a stockholder alters the fiduciary duty of a majority shareholder to him.
 
 Coleman,
 
 638 F.2d at 636-38.
 

 While, ordinarily, dividends must be apportioned among the stockholders pro rata to their several holdings, “it cannot be doubted that the stockholders may, by unanimous consent, adopt and become bound to a different mode of division.” And stockholders who assent to a discriminatory arrangement may thereby be es-topped to object.
 

 11 W. Fletcher,
 
 Cyclopedia of the Law of Private Corporations
 
 § 5352 (rev. perm. ed. 1971) (notes omitted). An agreement to distribute a corporation’s dividends in the form of rebates on purchases from the corporation is valid,
 
 Wabash Railway v. American Refrigerator Transit Co.,
 
 7 F.2d 335, 345-46 (8th Cir.1925), and is binding even on those shareholders who are no longer customers.
 
 Allied Supermarkets v. Grocers Dairy Co.,
 
 391 Mich. 729, 735-37, 219 N.W.2d 55, 58-60 (1974).
 

 In this case Reading and every other Trailer Train shareholder signed the Form A Car Contract. That contract explicitly stated that Trailer Train would charge users of pool cars the lowest possible car hire rates, and would not accumulate surplus earnings or profits from which pro rata dividends could be paid.
 
 See
 
 Del.Code Ann. tit. 8, § 170 (1975). Reading is bound by that agreement unless it can show that its purchase of the stock and assent to the car contract were- the products of fraud, misrepresentation, or overreaching,
 
 Esso Standard Oil Co. v. Cunningham,
 
 35 Del.Ch. 210, 215, 114 A.2d 380, 383 (Del.Ch.),
 
 aff’d,
 
 35 Del.Ch. 371, 118 A.2d 611 (Del.1955), which Reading has not ratified by accepting the benefits of the agreement,
 
 Eastern States Petroleum Co. v. Universal Oil Products,
 
 29 Del.Ch. 305, 313, 49 A.2d 612, 616 (Del.Ch.1946);
 
 see also
 
 13 W. Fletcher,
 
 supra,
 
 § 5737 (rev. perm. ed. 1980). Reading has not made such a showing, and it would be hard pressed to do so. Trailer Train adopted the policies expressed in the car contract long before Reading became a stockholder.
 
 See Schreiber v. Bryan,
 
 396 A.2d 512, 519 (Del.Ch.1978). Reading purchased its stock with full knowledge of those policies. See
 
 Goodman v. Futrovsky,
 
 42 Del.Ch. 468,473-74, 213 A.2d 899, 902-03 (Del.1965),
 
 cert. denied,
 
 383 U.S. 946, 86 S.Ct. 1197, 16 L.Ed.2d 209 (1966). Reading enjoyed the fruits of those policies for fifteen years without complaint,
 
 see Frank v. Wilson & Co.,
 
 27 Del.Ch. 292, 304-05, 32 A.2d 277, 282-83 (Del.1943), and expressed its approval of those policies both before and after it entered reorganization,
 
 see Elster
 
 v.
 
 American Airlines,
 
 34 Del.Ch. 94, 97-98, 100 A.2d 219, 221 (Del.Ch.1953). Given that it knew of, bargained for, assented to, and profited from Trailer Train’s car hire rate policies, Reading cannot now successfully argue that those policies constitute an impermissible dividend distribution scheme.
 
 Allied Supermarkets,
 
 391 Mich, at 736-37, 219 N.W.2d at 59-60.
 

 Thus, whether or not the car hire rates are constructive dividends, Reading is receiving exactly that benefit from its Trailer Train stock for which it bargained. Read
 
 *520
 
 ing contends nonetheless that since its conveyance of its rail properties to Conrail has permanently ended its enjoyment of its right of access to the pool cars, Trailer Train has engaged in self-dealing simply by failing to recognize Reading’s change of circumstances. Reading admits, however, that its departure from the railroad business was -not attributable in any way to Trailer Train or its majority shareholders but was the result of the Regional Rail Reorganization Act. In
 
 Getty Oil Co. v. Skelly Oil Co.,
 
 267 A.2d 883 (Del.1970), the Delaware Supreme Court held the intrinsic fairness test particularly inapplicable where the terms of the dispute between majority and minority stockholders are set not by the majority but by a third party such as the federal government.
 
 Id.
 
 at 887;
 
 see Trans World Airlines v. Summa Corp.,
 
 374 A.2d 5, 9 (Del.Ch.1977). Getty was the majority shareholder of Skelly, an independently-run oil company. Each company received a separate oil import allocation until the federal government, finding that Getty “controlled” Skelly, deprived Skelly of its separate quota. Skelly then tried to force Getty to share
 
 its
 
 allocation. The supreme court found that it was not Getty but the federal government that had fashioned the transaction and its terms, and the court refused to apply the intrinsic fairness test. Even if Skelly had been disadvantaged, Getty was not advantaged, and there was no self-dealing.
 
 Getty Oil,
 
 267 A.2d at 888;
 
 Sinclair Oil,
 
 280 A.2d at 720. Under such circumstances, the court concluded, Getty’s fiduciary duty to Skelly “does not require self-sacrifice.”
 
 Getty Oil,
 
 267 A.2d at 888; see
 
 Harriman v. E.I. du Pont de Nemours & Co.,
 
 411 F.Supp. 133, 154-55 (D.Del.1975). In this case, where the self-sacrifice requested is the partial liquidation of a corporation “because it is doing exactly what it was lawfully organized to do,”
 
 Berwald v. Mission Development Co.,
 
 40 Del.Ch. 509, 514-15, 185 A.2d 480, 483 (Del.1962), we do not believe that the Delaware courts would find that Trailer Train’s position constituted self-dealing.
 

 Reading cannot show that the operating railroads received something from the corporation to its exclusion and detriment. Reading has thus failed to prove that the majority shareholders engaged in self-dealing. The court below erred, therefore, when it applied the intrinsic fairness test.
 

 We must now apply the business judgment rule to Trailer Train’s reaffirmation of its car leasing policy, its refusal to pay dividends, and its continued reinvestment of earnings in new equipment. Each of the challenged policies can be attributed to a rational business purpose. Trailer Train’s car leasing policy, by setting the lowest possible car hire rates, presumably keeps demand for the cars high. The refusal to pay dividends could help achieve that goal by eliminating the need to raise rates to earn a surplus. The reinvestment of earnings in new equipment assumedly helps Trailer Train meet the flat car needs of its customers. Indeed, under the challenged policies Trailer Train has undergone remarkable growth. In the absence of “gross and palpable overreaching,” the decision of the Trailer Train board of directors to adhere to those policies must be upheld.
 
 See Sinclair Oil,
 
 280 A.2d 720-22;
 
 Getty Oil,
 
 267 A.2d at 887-88;
 
 Trans World Airlines,
 
 374 A.2d at 9. We conclude, therefore, that neither the directors nor the majority shareholders of Trailer Train have breached their fiduciary duty to Reading.
 

 Ill
 

 We will reverse the order of the court below and remand the case for further proceedings consistent with this opinion.
 

 [1]
 

 . Under § 401(a) of the Bankruptcy Reform Act of 1978, Pub.L. No. 95-598 § 401(a) 92 Stat. 2682, the Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, as amended, has been repealed. See 11 U.S.C. tables preceding § 101 (Supp. Ill 1979). The 1898 Act governs the instant case because it arose out of proceedings commenced under the 1898 Act. Pub.L. No. 95-598 § 403(a), 92 Stat. 2683;
 
 see also id.
 
 § 403(b).
 

 [2]
 

 .
 
 Reading’s president testified below that Reading acquired its shares in order “to obtain the additional equipment necessary to meet its customers needs.” App. at 281.
 

 [3]
 

 . Under ¶ 15 of the Form A Car Contract, shareholders must offer their stock to Trailer Train for repurchase at book value before they sell or otherwise dispose of the stock, or when they terminate the car contract. App. at 1034.
 

 [4]
 

 . Trailer Train had meanwhile retained outside consultants to study the company’s history, objectives and shareholder conflicts, including the nonuser shareholder issue. The consultants concluded that Trailer Train had always functioned much like a cooperative, that its stock was not and had never been intended to be an investment vehicle, and that benefit from stock ownership should continue to derive exclusively from use of the cars. Trailer Train then offered $1,500,000 for Reading’s stock but the trustees refused the offer. At oral argument counsel for Trailer Train informed us that its offer of $1,500,000 would remain open without regard to the outcome of this litigation.
 

 [5]
 

 . In addition, Trailer Train contends that, if it has breached a fiduciary duty to Reading, repurchase at book value is not a proper remedy. We need not reach that contention because of our disposition of the appeal.
 

 [6]
 

 . The court noted that Reading had its principal place of business in Pennsylvania, while Trailer Train was incorporated in Delaware. The disputed amount, the court rightly predicted, was more than $10,000. Finally, the court found that both Reading and Trailer Train were fully amenable to service of process in the Eastern District of Pennsylvania. App. at 26 & n. 1.
 

 [7]
 

 . The court allowed the parties to engage in extensive discovery, involving depositions of the parties and their expert witnesses, the exchange of interrogatories and requests for production of documents. In four days of hearings, the court received exhibits and heard both direct testimony and extensive cross-examination. The court applied the Federal Rules of Evidence,
 
 see, e.g.,
 
 app. at 843-69, and both
 
 *517
 
 counsel agreed that the case should be decided on the record developed by the parties in the instant litigation and not on the entire record in the reorganization proceedings, app. at 267-68.
 

 [8]
 

 . We note that Reading also retains the right to a pro rata share of the assets of Trailer Train upon its dissolution. Moreover, the rights Reading seeks, e.g., redemption on demand and compulsory dividends, are rights which no shareholder presently possesses.
 

 [9]
 

 . The court below apparently found Reading’s theory less than compelling, as it rejected the alleged dividends as the measure of Reading’s loss for two reasons. First, the court found that Trailer Train set its car hire rates to cover its own costs and not by reference to the ICC rates. Second, the court said that it was misleading for Reading to claim that the low prices were dividends to be shared pro rata among shareholders because “the return which each shareholder obtained was predicated [solely] upon
 
 use
 
 of the company’s equipment and not upon proportionate equity ownership.” 551 F.Supp. at 1219 (emphasis in original).
 
 See
 
 
 *519
 

 generally Klein v. Greenstein,
 
 24 N.J.Super. 348, 352-53, 94 A.2d 497, 499 (1953). The resemblance to dividends is especially tenuous in this case because Trailer Train’s low prices are extended even to non-shareholders in possession of Trailer Train cars, 551 F.Supp. at 1217 n. 5.