**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**UNIVERSAL FINANCIAL, Wayne Burton, Western Sierra Financial Corporation, California Equities Home Loan, Defendants.**

**Dr. Macy L. ABRAMS, et al., Specially Appearing Investors-Appellants,**

v.

**Robert A. BAKER, Court-Appointed Receiver for Defendants Universal Financial, Wayne Burton, Western Sierra Financial Corporation and California Equities Home Loan, Respondents-Appellees.**

No. 84–6050.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 3, 1985.

Decided May 17, 1985.

Alan Jay Weil, Bushkin, Gaims, Gaines & Jonas, Los Angeles, Cal., for specially appearing investors-appellants.

John C. Koutsos, Wyman, Bautzer, Rothman, Kuchel & Silvert, Los Angeles, Cal., Eric Summergrad, Rosalind C. Cohen, Washington, D.C., for respondents-appellees.

Before GOODWIN and NORRIS, Circuit Judges, and SOLOMON,* District Judge.

PER CURIAM:

Specially Appearing Investors ("Investors") appeal the district court's denial of their motion for an order relieving them from a receivership stay or, in the alternative, directing the Receiver to post a bond sufficient to indemnify them for all losses occasioned by the stay order. We have jurisdiction under 28 U.S.C. § 1292(a)(1) (1982), and we affirm.[1]

---

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

1. Investors also appeal from the district court's denial of their motion for an order collaterally estopping the Receiver from relitigating certain issues pertaining to their claims. In contrast to the denial of a motion to lift a receivership stay, which is an appealable interlocutory order under 28 U.S.C. § 1292(a)(1), see 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure: Jurisdiction* § 3923 n. 1 (1977) (and cases cited), the denial of a motion for collateral estoppel is an interlocutory order

Investors are a group of individual investors who entered into loan transactions through the services of various entities controlled by Wayne Burton (collectively "Burton"). Burton acted primarily as a mortgage loan broker, arranging secured real estate loans between investors and borrowers. Responding to solicitations from Burton, Investors placed their funds with Burton representatives, who promised to arrange secured trust deed loans on Investors' behalf with qualified borrowers approved by Burton. Many Investors relied upon Burton to find qualified borrowers for their loans, and had little or no information about borrowers or the properties in which they were to invest. Other Investors selected a particular borrower, type of property, or type of loan in connection with their loan transactions.

In exchange for their investments, Investors typically received a promissory note (the "Burton Note"), under which Burton agreed to pay Investors monthly interest and to repay the principal at maturity. Investors also received a document stating that the Burton Note would cover the interim period between the date funds were invested and the date escrow instructions were fulfilled, and were allegedly told the Burton Note was a "receipt" or "interim note."

Burton also located qualified borrowers who desired to take out junior trust deeds on their property. Borrowers independently agreed with Burton on the amount, terms and length of their loans. The source of funds for these loans was the money placed with Burton by Investors. At the time Burton funded a loan, Burton would identify specific Investors as the source of the loan proceeds.

In exchange for their loans, borrowers would execute a promissory note (the "Borrower Note"), secured by a junior deed of trust. In some cases the Borrower Note would identify individual Investors as payees on the note and beneficiaries of the trust deed. In other cases both instru-

ments were made out to Burton, which subsequently assigned Burton's rights to Investors. Investors were sent copies of the Borrower Notes and trust deeds several weeks or months after the close of escrow, along with copies of insurance policies and property appraisals. The originals of the Borrower Notes and trust deeds were kept by Burton as Investors' collection and servicing agent.

Beginning in 1980, Burton apparently attempted to change the nature of its business. Because of California's passage of Proposition 2, Burton concluded he was no longer restricted to arranging loans, but could instead borrow funds from Investors and make loans directly to borrowers. Burton began to fund larger loans by pooling together funds from several different Investors on a single Borrower Note, with Investors taking a proportionate fractionalized interest. Burton testified that after Proposition 2 he believed he was selling Investors a security interest in loans that he was arranging between Burton and borrowers, as opposed to acting as broker for transactions between Investors and borrowers.

In early 1981, the SEC brought an action for injunctive and other equitable relief against Burton, alleging numerous securities law violations. Among other things, the SEC alleged that Burton falsely represented to Investors that their loans would be secured by first trust deeds on borrowers' property, when in fact most of the Investors received only junior deeds of trust. Burton consented to entry of a permanent injunction and an order for accounting and anti-dissipation of assets. On March 24, 1981, the district court appointed a receiver to take control of and manage Burton's assets for the benefit of investors. The court also entered a stay of all legal proceedings by third parties against any of the defendants, the Receiver, or receivership property.

In July 1981, the Receiver proposed a plan that placed investors' claims into sev-

which is not immediately appealable absent certification under 28 U.S.C. § 1292(b). We there-

fore have no jurisdiction to review the district court's denial of the collateral estoppel motion.

eral classes, in accordance with the Receiver's theory of the legal effect of different types of transactions. The purpose of the proposed categories was to help determine who owned the Borrower Notes and supporting deeds of trust, the originals of which were held by the Receiver. Following several notices to investors explaining the proposed categories and stating the category into which each investor would be placed, and over the objection of Investors, the court approved a modified categorization proposal on December 1, 1982. The court did not reach the issue whether the Receiver had correctly categorized Investors, but held that whether Investors had ownership interests in their Borrower Notes would have to be litigated in trials pursuant to the court's summary jurisdiction.

At the suggestion of the district court, counsel for Investors and the Receiver agreed to try two so-called "test cases" in order to expedite the litigation. After extensive discovery, the test cases were tried in the spring and summer of 1983. On March 1, 1984, the district court held that, based upon the intent of the parties "as evidenced by all the circumstances surrounding the subject transaction[s] including the language of the documents themselves," the investors in the test cases had ownership interests in their Borrower Notes, and had the right to enforce these interests free of any claim by the Receiver. The court subsequently ordered counsel to select ten additional cases for trial.

In April 1984, Investors filed motions for an order collaterally estopping the Receiver from relitigating the issues involved in the test cases, and relieving them from the court's March 24, 1981 stay order. In the alternative, they requested that the Receiver be ordered to post a bond sufficient to indemnify them for all losses occasioned by the court's stay order. These motions were denied on June 8, 1984, and this appeal ensued.

## I. SUMMARY JURISDICTION OF THE DISTRICT COURT

■ Investors first contend that the district court could not summarily adjudicate their claims to the Borrower Notes, because the test cases had established that Investors are the unconditional owners of the rights evidenced by these notes. They assert that summary jurisdiction is unconstitutional where an · adverse claimant presents a substantial claim that he, rather than a receiver or trustee, is the owner of an intangible chose in action.

We agree with the Receiver, however, that the distinction between summary and plenary proceedings was of no consequence here because the district court afforded Investors virtually all of the procedural protections which would have been available in plenary proceedings. *See Matter of Reading Co.*, 711 F.2d 509, 516–17 (3rd Cir.1983), (quoting 2 J. Moore & R. Oglebay, *Collier on Bankruptcy* ¶ 23.02, at 442 (14th ed. 1976)). Investors were allowed extensive discovery, including the right to take depositions, and were permitted to file numerous briefs and exhibits in connection with the test cases. The court applied the Federal Rules of Evidence and the Federal Rules of Civil Procedure. Although there was no formal complaint or answer, Investors cannot seriously claim that they lacked notice of the nature of the proceedings. Because Investors cannot explain how the summary proceedings differed from the process they would have received in a plenary suit, their challenge to the district court's exercise of summary jurisdiction must fail.

## II. REFUSAL TO LIFT THE STAY

■ Investors claim the March 24, 1981, stay order is an injunction, and that the district court therefore should have applied the traditional equitable criteria for continuing an injunction in ruling on their motion to lift the stay. The district court, however, committed no legal error in this regard. This circuit has not applied the traditional preliminary injunction test in ruling on motions to except applicants from a blanket receivership stay. We have instead set forth three factors to consider in deciding whether to lift a receivership stay:

(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim.

*SEC v. Wencke,* 742 F.2d 1230, 1231 (9th Cir.1984) ("*Wencke II*"), (citing *SEC v. Wencke,* 622 F.2d 1363, 1373–74 (9th Cir. 1980) ("Wencke I")).

■ This test differs in emphasis from the traditional equitable criteria employed by courts to decide whether to grant, deny, or continue a preliminary injunction. The traditional preliminary injunction test would require the Receiver to show a probability of success on the merits and the possibility of irreparable harm to the receivership if the stay is not continued. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200–01 (9th Cir.1980). The *Wencke* test simply requires the district court to balance the interests of the Receiver and the moving party. *Wencke I,* 622 F.2d at 1373. As the *Wencke I* court noted, the interests of the Receiver are very broad and include not only protection of the receivership *res,* but also protection of defrauded investors and considerations of judicial economy. *Id.* at 1372–73. This is a corollary of the district court's power to enter a blanket stay. *Id.* at 1369. This power is broader than the court's authority to grant or deny injunctive relief under Fed.R.Civ.P. 65. *Id.* at 1371.

■ We use the abuse of discretion standard to decide whether the district court correctly applied the *Wencke* criteria to this case. *See Wencke II,* 742 F.2d at 1231, (citing *Wencke I,* 622 F.2d at 1374) (appellate court applies abuse of discretion standard in reviewing district court's application of *Wencke* factors and its ultimate decision).

■ Our first concern is preservation of the status quo. Investors argue that, far from preserving the status quo, continuation of the stay has impeded their ability to enforce the obligations embodied in the Borrower Notes. They point out that the Receiver has stipulated to the release of many properties from the stay order, after concluding that neither the receivership nor investors have any equity in the properties.

Although Investors present a sympathetic case, we agree with the Receiver that the stay, by preventing senior lienholders from foreclosing on their superior security interests in borrowers' property, has preserved the status quo and in fact benefitted Investors, most of whom hold third, fourth and fifth trust deeds. One of the main reasons cited by Judge Byrne in refusing to lift the stay was that he was convinced lifting the stay would "wipe out" Investors in ways they could not envision. At this interlocutory stage, we decline to second-guess Judge Byrne as to the probable effect of lifting the stay, given his long-standing involvement with the proceedings.

We are also persuaded that if the stay were lifted and Investors sought to enforce their interests, the Receiver, as an adverse claimant to the Borrower Notes, would intervene or have to be joined in any future court action. *See* Fed.R.Civ.P. 19, 24. This would result in a multiplicity of actions in different forums, and would increase litigation costs for all parties while diminishing the size of the receivership estate.

■ Our second concern is the point in the course of the receivership at which the motion for relief from stay was made. In *Wencke II,* the court stated:

Where the motion for relief from the stay is made soon after the receiver has assumed control over the estate, the receiver's need to organize and understand the entities under his control may weigh more heavily than the merits of the party's claim. As the receivership progresses, however, it may become less plausible for the receiver to contend that he needs more time to explore the affairs of the entities. The merits of the moving par-

ty's claim may then loom larger in the balance.

622 F.2d at 1373–74 (footnote omitted). While the *Wencke I* court upheld the district court's refusal to lift the stay four years later, the *Wencke II* court felt the stay had continued long enough and should be lifted. The court observed that the receiver had discovered no new material facts during the last six years, and that the receiver was prepared to distribute the estate's assets upon court authorization, thereby indicating he had disentangled the estate and needed no additional time. *Wencke II*, 742 F.2d at 1232.

The situation here is somewhere between the facts in *Wencke I* and *Wencke II*. The stay has been in place almost four years, yet, unlike *Wencke II*, material facts continue to come to light through discovery and testimony in the test cases. While the Receiver has had sufficient time to analyze Burton's business and become familiar with the estate, there are additional factual and legal issues which still must be resolved in order to determine ownership of the Borrower Notes. Because of the issues yet to be resolved, Judge Byrne ordered the parties to prepare ten additional cases for trial. Far from being "tantamount to a permanent stay," *Wencke II*, 742 F.2d at 1232, the present stay is a flexible device which Judge Byrne has explicitly stated may be challenged at any time.

■ The merits of the underlying claim must also be considered. We agree with Investors that the outcome in the test cases, while not determinative of Investors' claims, makes it likely they will prevail in future litigation. Indeed, the Receiver and the SEC do not seriously dispute that the final *Wencke* factor tips in Investors' favor. However, because of the havoc which would ensue if the stay were lifted at this time, we do not believe Judge Byrne abused his "substantial discretion" in refusing to lift the stay. *See Wencke I*, 622 F.2d at 1374. Judge Byrne has ordered ten additional cases to be tried, and has encouraged the parties to enter into extensive settlement negotiations. Apparently, the district court has recently authorized the Receiver to accept all Investor objections, liquidate the assets in the estate, and pay 90% of the proceeds realized from each liquidated Borrower Note to be paid to objecting Investors. Under these circumstances, it would be premature for this court to order Judge Byrne to lift the stay.

## III. REFUSAL TO POST A BOND

■ As an alternative argument, Investors assert the court below abused its discretion in refusing to require the Receiver to post a bond sufficient to indemnify them for all losses occasioned by continuation of the stay. We disagree. While a district court has discretion to require a receiver to post a bond in appropriate circumstances, *Wencke I*, 622 F.2d at 1375 (and cases cited therein), Investors have failed to demonstrate that posting a bond is necessary to protect their interests. In our view, the main effect of requiring such a bond would be to deplete further the resources available to Investors and others with an interest in the receivership estate.

AFFIRMED.