**In the Matter of READING COMPANY, Debtor.**

**Bankruptcy No. 71–828.**

United States District Court, E.D. Pennsylvania.

April 10, 1986.

---

Howard H. Lewis, James Sox, Philadelphia, Pa., for Trustees.

J. Dennis Faucher, Philadelphia, Pa., Scott D. Patterson, Michale C. Bynane, Cleveland, Ohio, for Western Maryland.

John B. Rossi, Brian S. North, Philadelphia, Pa., for Conrail.

## MEMORANDUM AND ORDER

DITTER, District Judge.

In order to assure adequate train connections between their lines, the Western Maryland Railroad Co. ("Western Maryland") and predecessors to the now-reorganized Reading Co. (Reading)[1] entered into an agreement. This 1898 contract, known as the "Altenwald Agreement" provided for the creation of a 19-mile line of track that would link the two railroads, allowing each railroad to benefit from certain key interchanges of the other.

Under the agreement, the Western Maryland was to use the chartered rail privileges of a third company, the Washington and Franklin Railway Co. (W & F),[2] and construct the line on behalf of W & F. Reading obligated itself to purchase all the stock and bonds of W & F in order to provide the funds necessary for this construction. Upon completion of the work, Western Maryland was to lease the new

---

1. The agreement, as drafted, was reached among the Philadelphia and Reading Railway Co., the Reading Co., and the Western Maryland Railroad Co. It is not disputed that the debtor succeeded to the interests of the Philadelphia and Reading Railway Co. and the Reading Co.

2. The chartered rail privileges belonged to the Hagerstown and State Line Railroad Co., a Maryland corporation, and the Washington and Franklin Railroad Co., a Pennsylvania corporation. These corporations were merged to become the Washington and Franklin Railway Co.

line from W & F, provide a mileage prorate for business passing over the line, and pay five percent yearly on the W & F bonds and stock purchased by Reading.

In 1901, after construction was finished and Reading had purchased all the stock and bonds issued by W & F, Western Maryland and W & F entered into a 995-year lease. The lease incorporates verbatim the Altenwald Agreement and requires Western Maryland to pay $7500 annually to the holders of W & F stock in return for a leasehold interest in all properties owned by W & F.

Presently before me is the pre-reorganization petition by the Reading Trustees to both disaffirm the lease and collect damages for breach of the lease. Western Maryland, joined by Conrail,[3] has responded by asserting that the lease may not be disaffirmed by Reading and the court is without jurisdiction to consider the breach of contract claim.

First, I will address the question of whether the Reading trustees may reject the W & F and Western Maryland lease. Section 77(a) of the Bankruptcy Act provided that reorganization courts "have exclusive jurisdiction of the debtor and its property wherever located...." 11 U.S.C. § 205(a) (repealed 1979). Additionally, in order to provide adequate means for execution of the plan of reorganization, the executory contracts of the debtor may be rejected. *Id.* § 205(b).

Western Maryland and Conrail argue that the W & F lease is neither Reading's property nor its contract. They assert that if Reading wanted to include the property of W & F in its reorganization, it could have done so by having W & F file a reorganization petition in the Reading reorganization. *See id.* § 205(a); 5 L. King, *Collier on Bankruptcy* ¶ 1161.03 (15th ed. 1985); 5 J. Moore & L. King *Collier on Bankruptcy* ¶ 77.03 (14th ed. 1978).

Reading argues that although a separate corporate existence was created for W & F,

it has no operational vitality since all its assets have been "perpetually" leased to Western Maryland and the rents which its lessee owes are payable directly to Reading. Reading contends that W & F is a mere sham or shell and, as a matter of federal bankruptcy law, the court should view the 1901 agreement as Reading's lease and property.

■ Congress has not given reorganization courts exclusive jurisdiction over all controversies that in some way affect the debtor. *See Callaway v. Benton*, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949). Nonetheless, "[t]he tendency of judicial interpretation of the Act has been in the direction of progressive liberalization in respect of the operation of the bankruptcy power so as to meet the challenge of present day economic and business conditions." *In re International Power Securities Corp.*, 170 F.2d 399, 402 (3d Cir.1948).

■ In general, and absent unusual circumstances, the property of a debtor's subsidiary is not considered property of the debtor by virtue of the debtor's sole ownership of the subsidiary. *See In re South Jersey Land Corp.*, 361 F.2d 610 (3d Cir. 1966). *See also Parkview-Gem, Inc. v. Stein (In re Parkview Gem)*, 516 F.2d 807 (8th Cir.1975); *In re Unishops Inc.*, 494 F.2d 689 (2d Cir.1979) (per curiam); *In re Beck Industries, Inc.*, 479 F.2d 410 (2d Cir.), *cert. denied*, 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973); *General American Tank Car Corp. v. Gobel, (In re Gobel)*, 80 F.2d 849 (2d Cir.1936). The Third Circuit has noted that while as a general matter the debtor's property does not transcend the boundaries of its corporate identity, there are exceptions to the general rule and that in the past the court "has not hesitated to disregard the traditional theories of separate entities." *In re South Jersey Land Corp.*, 361 F.2d at 613.

■ Courts will not allow the corporate form to be used to defeat public policy,

---

**3.** After the Trustees' petition had been filed, Western Maryland moved to join Conrail in the proceedings. All parties have agreed that Con-

rail could participate in argument pertaining to the legal issues raised by Reading's petition and Western Maryland's response.

justify wrong, or perpetrate fraud, but will look beyond that form as justice may require. *See In re Penn Central Securities Litigation,* 335 F.Supp. 1026, 1035 (E.D.Pa. 1971). This scrutiny may be available not only for the purpose of holding a corporation liable for the debts of its parent or subsidiary, but also to allow creditors of that corporation to reach the assets of the parent or subsidiary. *Stone v. Eacho,* 127 F.2d 284 (4th Cir.), *cert. denied,* 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942); 6 J. Moore & L. King, *Collier on Bankruptcy* ¶ 3.11, at 492 n. 6 (14th ed. 1978).

Public need, and in particular the public interest in maintaining rail transportation service, may also influence a court to look beyond corporate formalities. In *In re Pittsburgh Railways,* 155 F.2d 477 (3d Cir.), *cert. denied,* 329 U.S. 731, 67 S.Ct. 90, 91 L.Ed. 632 (1946), the debtor was the operator of the Pittsburgh transit system. *Id.* at 479. It had acquired the ability to operate the transit system as a unified whole by entering into leases, operating contracts, and franchise agreements with numerous companies, each of which had the ability to control a fraction of the city's total transit needs. *Id.* at 479–82. Through stock ownership or interlocking directorates all of these companies were controlled by the debtor or the holding company which owned the debtor. *Id.*

The City of Pittsburgh petitioned the reorganization court to exercise jurisdiction over all the underlying companies. *Id.* at 479. The reorganization court declined, stressing that the separate corporate personalities of the companies precluded it from exercising jurisdiction over entities other than the debtor. *Id.* at 482–83. The court of appeals reversed. The Third Circuit first observed that it was concerned, not with the application of state corporate law, but rather with construction of the federal bankruptcy laws:

> [G]ranted, that the inter-corporate relations set up among these concerns was a matter in the accomplishment of which they properly followed Pennsylvania law, it is now a question for the judicial application of the bankruptcy law to determine what effect those inter-corporate relations have in reorganization court.
>
> The effect of a grant of a corporate charter to a group of individuals is described in many ways in figurative language. Perhaps the favorite phrase is the 'corporate veil' which courts are supposed to pierce from time to time as circumstances require. We think a more accurate figure is that of a cloak which on some occasions is to be worn and on other occasions is to be stripped off. To talk legal effect instead of fanciful figures of speech, the corporate fiction can be given effect in some instances and with perfect consistency, disregarded in other instances.

*Id.* at 484.

Focusing on the urgent public need for unified reorganization of the city's transit system and the fact that the companies' assets were intermingled and operated as a unit, the court of appeals concluded that the district court had erred in refusing the city's petition.[4] *Id.* at 480–81, 485.

■ This case presents none of the factors which would warrant ignoring the corporate distinction between Reading and W & F. There is no allegation that the distinction was in any way fraudulent or wrongful. The assets of W & F have not been operated as part of Reading. Moreover, allowing the Reading trustees to reject the lease would frustrate rather than advance the public interest in continued rail operation. The lease allows Western Mary-

---

**4.** Some question as to the vitality of *Pittsburgh Railways* has been cast by the Supreme Court's decision in *Callaway v. Benton,* 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949). *See* 6 J. Moore & L. King, *Collier on Bankruptcy* ¶ 3.11, at 493 n. 7 (14th ed. 1978). Certainly, however, *Pittsburgh Railways* remains good law to the extent it is read to say that a reorganization court is empowered to look beyond corporate formalities in certain cases. Furthermore, the enactment of the Rail Act, 45 U.S.C. § 701 et seq., could provide congressional support for the proposition that the public interest in continued rail service provides a basis for overlooking corporate formalities.

land, an operating railroad, to continue rail services between the former Reading lines and its own lines. Rejecting the leases would only interfere with the services provided by Western Maryland, with the only benefits flowing to the creditors of Reading, no longer a functioning railroad.

Consequently, I can find no basis for overlooking the corporate formalities—which Reading established and from which it may have gained advantage [5]—to construe the federal bankruptcy laws so as to say that the ownership of W & F by Reading allows the Reading trustees to reject the lease.[6]

■ Reading also purports to set forth state law breach-of-contract claims against Western Maryland stemming from the 1901 lease and the lease's incorporation of the Altenwald Agreement. Reading claims that Western Maryland breached two provisions of the lease of which Reading is a third-party beneficiary.

First, Reading argues that Western Maryland breached a covenant which precluded the lessee from pledging the lease without Reading's consent. Second, Reading argues that Western Maryland has failed to make certain mileage pro-rate payments. These breaches, according to Reading, entitle it to enter the leased premises, declare the lease in default, and recover damages.

Western Maryland and Conrail assert that the court lacks subject matter jurisdiction over the claims. I reluctantly agree.

■ A reorganization court has "summary jurisdiction" to adjudicate controversies relating to property over which it has actual or constructive possession. *Thompson v. Magnolia Printing Co.,* 309 U.S. 478, 481, 60 S.Ct. 628, 629, 84 L.Ed. 876 (1940). Jurisdiction over such property is characterized as "summary" because the claims are resolved in informal proceedings, free from formal procedural rules which would attend a "plenary" adjudication. *In re Reading Co.,* 711 F.2d 509, 515 (3d Cir. 1983).

■ A chose in action, such as Reading's here, may be the property of the debtor within the meaning of section 77(a), *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 471 n. 7, 94 S.Ct. 2504, 2507 n. 7, 41 L.Ed.2d 243 (1974), and a reorganization court may exercise summary jurisdiction to determine whether the debtor has *title* to that chose in action. *See In re Reading Co.,* 711 F.2d at 515. However, a reorganization court may not exercise summary jurisdiction to *enforce* a chose in action unless the obligor does not dispute the existence and amount of its obligation to the debtor. *Id.* at 515–16 (citing *In re Penn Central Transp. Co.,* 477 F.2d 841, 844 (3d Cir.), *aff'd in part,* 414 U.S. 885, 94 S.Ct. 231, 38 L.Ed.2d 137 *cert. denied in part,* 414 U.S. 923, 94 S.Ct. 219, 38 L.Ed.2d 157 (1973); *In re Lehigh Valley Railroad,* 458 F.2d 1041 (3d Cir.1972)). Where the alleged obligor raises a bona fide and substantial dispute concerning its obligation under the chose in action, the reorganization court lacks summary jurisdiction. *Id.*

---

**5.** For example, by offering the lease through a subsidiary, Reading may have avoided the obligation of obtaining shareholder consent prior to leasing out the new line. *See* Meck & Masten, *Railroad Leases and Reorganization,* 49 Yale L.J. 626, 629 & n. 14 (1940). Moreover, by creating a subsidiary the property owned by the subsidiary could be kept free from the liens of Reading creditors.

**6.** Moreover, I cannot find that the terms of the 1901 lease bring the agreement within the meaning of an executory contract of the debtor as used in § 77(b). In order for a contract to be truly "executory" within the meaning of § 77, there must be performance due from both the debtor and the debtor's obligor. *Cf.* Country-

man, *Executory Contracts in Bankruptcy,* 57 Minn.L.Rev. 438, 450–61 (1973). *See also* 6 J. Moore & L. King, *Collier on Bankruptcy* ¶ 3.23[1], at 566 n. 8 (14th ed. 1978). Reading has not argued that it still owes performance to either W & F or Western Maryland. Although W & F and Western Maryland have an existing, unexpired lease, which by definition is executory, I have already concluded that Reading cannot stand in W & F's shoes in this regard. Consequently, even assuming the terms of the 1901 lease make it "Reading's contract," it is not executory with respect to the debtor and the debtor cannot disaffirm or reject it pursuant to section 77.

at 516. Instead, the trustee must proceed with a plenary action in a court of general jurisdiction that has personal jurisdiction over the alleged obligor.[7] *Id.*

This case does not involve a dispute over the title to choses in action, but rather it concerns whether Reading may enforce those choses in action.[8] Thus, if Western Maryland has asserted bona fide and substantial defenses to Reading's claims, this court is without summary jurisdiction.

Reading's argument on the merits of its first claim is as follows. The lease agreement expressly requires Western Maryland to obtain W & F's consent prior to pledging the lease. The Altenwald Agreement, which is incorporated in the lease, provides that the lease shall contain covenants against transfer or assignment of the lease without Reading's consent. Therefore, Reading argues, it is a third-party beneficiary of the clause in the *lease* limiting assignment and pledging, and it may enforce that clause and declare the lease in default.

Western Maryland and Conrail assert that Reading is not a third party beneficiary under the lease, and that even if Reading were such a third-party beneficiary, it would not be entitled to exercise the lessor's remedies of entry and declaration of default. They argue that although the Altenwald Agreement gave Reading the power to approve or disapprove pledges of the subsequent lease, the lease only gives that right to W & F. Resolution of these arguments will require the court to determine the intent of the parties at the time of the agreement. This question of intent is likely to develop into a debate over the applicability of the parol evidence rule and other contract-interpretation devices. Because I cannot say that these arguments are not bona fide and substantial, I lack summary jurisdiction to consider Reading's contentions.

Reading also advances a third-party beneficiary argument in support of its claim that Western Maryland has breached the lease by failing to pay the mileage pro-rate set forth in the Altenwald Agreement. The Altenwald Agreement contained a mileage pro-rate clause which allocated revenue between Reading and Western Maryland for business conducted over the rail link. Rather than giving the Western Maryland the customary preferred position as the shorter carrier, the parties agreed in the Altenwald Agreement to pro-rate revenue on the basis of miles covered by the two lines. *See* Tr. at 4 (September 19, 1979). The lease provides Western Maryland "full and exclusive right to manage, use, operate and control [the] demised premises, and to regulate and determine the rates, tolls, freight and charges of transportation over the whole or any part of said demised premises except as otherwise provided by law and by said agreement of February 21, 1898 [Altenwald Agreement], and to charge and collect the same to its own use...."

Western Maryland ceased paying Reading mileage pro-rate revenues after Reading conveyed its operating assets to Conrail in 1976. Reading maintains that this failure constitutes a breach of the lease for which it may both enter the leased premises and collect damages. With respect to Reading's right to enter, Western Maryland and Conrail again assert that the contract between W & F and Western Maryland cannot be construed as giving Reading that right as a third-party beneficiary. Just as with the covenant not to pledge, I would be called upon to decide the competing arguments, both of which seem to have some appeal. With respect to Reading's damages assertion, Western Maryland argues that the lease only makes the *setting*

---

7. The reorganization court may qualify as a court of general jurisdiction if another basis of federal jurisdiction, such as diversity of citizenship or the presence of a federal question, is present. *See In re Reading Co.,* 711 F.2d at 516–17 (diversity of citizenship). *See also* 11 U.S.C. § 46(a) (repealed 1979).

8. Although much of the dispute centers around whether Reading, W & F, or both can assert claims against Western Maryland, there is no question that the right to pursue Western Maryland as a third-party beneficiary of the 1901 lease belongs to Reading.

of rates subject to the provisions of the Altenwald Agreement. It argues that the proviso leaves unfettered Western Maryland's right to *collect* charges for its own use. Western Maryland thus argues that even assuming that the Altenwald Agreement provides for the revenue distribution which Reading claims, the *lease* does not provide this for Reading. This argument also involves resolution of intent questions and thus, in my opinion, places this case outside the scope of my jurisdiction.

It may well be that Reading will succeed in all of its claims, but that is not the point. The question is whether Western Maryland has asserted substantial and bona fide defenses, thus precluding the exercise of summary jurisdiction. As I have stated, Western Maryland has raised such questions. Therefore, because Reading has elected to pursue causes of action only under the lease agreement, and Western Maryland has advanced substantial arguments in response, I must conclude that I am without summary jurisdiction.

As there exists no other basis for general federal jurisdiction, I cannot consider Reading's contract claims. Because of my disposition of these issues, there is no need to join Conrail as a party or consider its argument that several of these issues must be heard in the Special Rail Court.